## Wytheville.

### J. R. HARRIS v. COMMONWEALTH.

June 11, 1925.

Argued before Judge Chichester took his seat.

1. INTOXICATING LIQUORS—*Construction of Prohibition Act—Act Construed as a Whole—Intent of Legislature—Object of the Act.*—The prohibition act (Acts of 1924, page 593), contains many provisions, and it would be remarkable if they were all perfectly clear and there were no apparent inconsistencies between them. But the statute must be construed as a whole, bearing in mind, where it is manifest, the object sought to be attained. It is not permissible to treat one section of an act which is not clear and plain as a detached statement of the law, but it should be considered in connection with other related sections bearing on the same subject, however far apart the sections may be in the act. It is the legislative intent as manifested in the act as a whole that is sought.

2. STATUTES—*Construction—Punctuation.*—Punctuation is said to be the most fallible of all standards by which to interpret a statute.

3. STATUTES—*Construction—Grammatical Effect.*—Generally, proper grammatical effect will be given to the arrangement of words in a sentence of a statute, but if, in so doing, a single sentence or section is left ambiguous, or subject to more than one construction, the application of rules of grammar will not be permitted to defeat the purpose of the act, if that can be otherwise ascertained.

4. STATUTES—*Construction—Object of the Statute.*—When we know the object of a statute and are called upon to construe a phrase or a sentence which, standing alone, may be susceptible of different interpretations, we know of no safer rule than to take the statute by its four corners and critically examine it as a whole to ascertain the legislative intent, as manifested by its different provisions. If, upon such an examination, an interpretation can be made, consistent with the language used, which will carry into effect the object sought to be accomplished by the statute, that interpretation should be adopted, in preference to one which would be equally consistent with the language used, standing alone, but which would defeat, or tend to defeat the manifest intent of the legislature.

5. INTOXICATING LIQUORS—*Prohibition Act—Object of the Act—Exceptions.*—The prime object of the prohibition act was to break up and to prevent the use of ardent spirits as a beverage, and to attain this end stringent measures were adopted to prevent its manufacture, sale or transportation, except under the most restricted and carefully guarded regulations. These regulations were deemed essential to the vitality of the act, and those who would seek to manufacture the prohibited article and escape the penalties provided by the act must bring themselves within the exception.

6. INTOXICATING LIQUORS—*Manufacture of Wine or Cider "at his Home."*—Section 32 of the prohibition act of 1924 (Acts of 1924, page 593), provides that "the provisions of this act shall not be construed to prevent any person from manufacturing for his domestic consumption at his home * * * wine or cider from fruit of his own raising * * *." Standing alone, the language of the' section might mean that the manufacturing might be done anywhere, and, as incident thereto, there would exist the right to transport to his home, which is the only place of lawful storage. Such a construction, however, was manifestly never intended by the legislature, and is inconsistent with other provisions of the statute. If, however, the phrase "at his home" be construed to apply to the place of manufacture, the statute is harmonious and consistent as a whole.

7. INTOXICATING LIQUORS—*Manufacture of Wine and Cider "at his Home"—Manufacture at a Farm of Accused and Transportation to his Home.*—Section 12 of the prohibition act of 1924 (Acts 1924, page 593), provides that "the possession by any person of ardent spirits at any place other than his permanent *bona fide* home shall be unlawful, and the possession at such home shall be unlawful unless the ardent spirits shall have been lawfully acquired from a person or persons authorized by law to furnish the same, or wine manufactured in the home not in violation of the provisions of this act." Under section 32, wine made from fruit of the manufacturer's "own raising" may be manufactured ."at his home" and under section 12 such wine may be stored "in the home." Construing sections 32 and 12 together, wine manufactured by accused, who lived in Greensville county, at a farm owned by him in Brunswick county was not manufactured by accused either at or in his bona fide home, and, hence was unlawful. His possession of it being unlawful, his transportation of it from his farm to his home was also unlawful.

Error to a judgment of the Circuit Court of Greensville county.

*Affirmed.*

The opinion states the case.

*Buford* and *Raney*, for the plaintiff in error.

*Attorney-General John R. Saunders, Assistants Attorney-General Leon M. Bazile* and *Lewis H. Machen*, for the Commonwealth.

BURKS, J., delivered the opinion of the court.

Harris was convicted of illegally transporting two gallons of wine and was fined $300.00 and sentenced to confinement in jail for three months. He lived in Greensville county, Virginia, but owned a farm in Brunswick county which was occupied by his daughter, whom he from time to time visited, sometimes for a week at a time. He testified that "he made the wine in question from dewberries grown on his land in Brunswick county for his domestic consumption at his home and not to be sold, dispensed or given away in violation of law." The offense of which he was convicted was the transportation of this wine from the farm in Brunswick. He testified that he was on his way to his home in Greensville, with the wine, when he was prevented from carrying it there by prohibition officers, and we may assume that to be a fact.

Omitting minor details, the real question at issue is: Did Harris have the right to make the wine in Brunswick county? If he did not, then the manufacture was unlawful, and if so, the transportation of it was unlawful.

[1] The prohibition act of 1924 (Acts 1924, page 593), contains one hundred sections and prints forty-two pages. It contains many provisions, and it would be remarkable if they were all perfectly clear and there were no apparent inconsistencies between them. But the statute must be construed as a whole, bearing in

mind, where it is manifest, the object sought to be attained. It is not permissible to treat one section of an act which is not clear and plain as a detached statement of the law, but it should be considered in connection with other related sections bearing on the same subject, however far apart the sections may be in the act. It is the legislative intent as manifested in the act as a whole that is sought.

In 25 R. C. L., 1007-8, it is said: "It is an established rule in the exposition of statutes that the intention of the lawgiver is to be deduced from a view of the whole, and of every part of a statute, taken and compared together. The several provisions of the statute should be construed together in the light of the general purpose and object of the act and so as to give effect to the main intent and purpose of the legislature as therein expressed. If possible, a statute should be so construed as to render it a consistent and harmonious whole; if different portions seem to conflict, they should, if practicable, be harmonized, that construction being favored which will render every word operative rather than one which makes some words idle and nugatory. In other words, a statute must receive such construction as will make all its parts harmonize with each other, and render them consistent with its general scope and object. The various provisions of an act should be read so that all may, if possible, have their due and conjoint effect without repugnancy or inconsistency. The court may not, in order to give effect to particular words, virtually destroy the meaning of the entire context; that is, give the particular words a significance which would be clearly repugnant to the statute, looked at as a whole, and destructive of its obvious intent."

Section 32 of the act, so far as it need be quoted, is as follows: "The provisions of this act shall not be construed to prevent any person from manufacturing for

his domestic consumption at his home   *   *   *   wine or cider from fruit of his own raising   *   *."

It will be observed that there is no punctuation mark from the beginning of the sentence to the word "home." The words "at his home" may apply to the manufacturing or to the consumption. If there had been a comma after "manufacturing" and one after "consumption," it would have probably indicated that "at his home" was applicable to the manufacturing. On the other hand, if there had been a comma after "manufacturing" and one after "home," it would probably have indicated that "at his home" was applicable to the consumption, but there are no such commas here, and the language used must be interpreted without them.

[2] Punctuation is said to be the most fallible of all standards by which to interpret a statute, but, in the instant case, we have not even this to assist us, and must seek other means by which to determine the meaning of the language used.

[3] Generally, proper grammatical effect will be given to the arrangement of words in a sentence of a statute, but if, in so doing, a single sentence or section is left ambiguous, or subject to more than one construction, the application of rules of grammar will not be permitted to defeat the purpose of the act, if that can be otherwise ascertained.   Black on Interpretation of Laws, page 70.

"It is well settled that statutes are not to be construed by strict and critical adherence to technical grammatical rules, and that the true meaning, if clearly ascertained, must prevail, though contrary to the apparent grammatical construction.  The same rule applies in respect of faulty collocation of words or clauses, and while the collocation of the words and phrases in a statute is sometimes an aid in the construction of a statute, and should not be arbitrarily disregarded, it should not

control where the intention of the legislature requires it to be disregarded." 25 R. C. L. 964-5; *United States* v. *Lacher*, 134 U. S. 624, 10 S. Ct. 625, 33 L. Ed. 1080.

[4] When we know the object of a statute and are called upon to construe a phrase or a sentence which, standing alone, may be susceptible of different interpretations, we know of no safer rule than to take the statute by its four corners and critically examine it as a whole to ascertain the legislative intent, as manifested by its different provisions. If, upon such an examination, an interpretation can be made, consistent with the language used, which will carry into effect the object sought to be accomplished by the statute, that interpretation should be adopted, in preference to one which would be equally consistent with the language used, standing alone, but which would defeat, or tend to defeat, the manifest intent of the legislature.

[5, 6] The prime object of the prohibition act was to break up and to prevent the use of ardent spirits as a beverage, and to attain this end stringent measures were adopted to prevent its manufacture, sale, or transportation, except under the most restricted and carefully guarded regulations. These regulations were deemed essential to the vitality of the act, and those who would seek to manufacture the prohibited article and escape the penalties provided by the act must bring themselves within the exception. Section 32 of the act, as we have seen, so far relaxed the rule of manufacture as to permit any person to manufacture "for domestic consumption at his home," wine and cider from fruit of his own raising. Standing alone, the language of the section might mean that the manufacturing might be done anywhere, and, as incident thereto, there would exist the right to transport to his home, which is the only place of lawful storage. As there is no limit to the

amount that may be manufactured, one might own a vineyard in Wise county, make an unlimited quantity of wine there, keep it in his country home, and from time to time transport it to his home in the city of Richmond. Such a license would seriously impair, if it did not destroy, the enforcement of the statute against the manufacture of wine. Such a construction was manifestly never intended by the legislature, and is inconsistent with other provisions of the statute. If, however, the phrase "at his home" be construed to apply to the place of manufacture, the statute is harmonious and consistent as a whole, and gives full effect to what appears to be the manifest intent of the statute.

[7] Section 12 of the act declares that "the possession by any person of ardent spirits at any place other than his permanent *bona fide* home shall be unlawful, and the possession at such home shall be unlawful unless the ardent spirits shall have been lawfully acquired from a person or persons authorized by law to furnish the same, or wine manufactured in the home not in violation of the provisions of this act."

Under section 32, wine made from fruit of the manufacturer's "own raising" may be manufactured "*at* his home" and under section 12 such wine may be stored "*in* the home." Having fixed a lawful place of manufacture and a lawful place of storage, the right to transport from the one place to the other, if they are different, follows as a necessary incident. No other transportation of such wine is allowed by the statute, without a permit under section 74. Mere possession, whether in transit or not, "at any place other than his permanent *bona fide* home," is made unlawful by section 12.

Section 32 applies to the *manufacture* of both wine and cider, and the words used are "*at* his home" and not,

"*in* the home." Section 12 makes no mention of cider, but, referring to wine only, speaks of "wine manufactured *in* the home," doubtless because wine is usually an indoor product.

Construing sections 32 and 12 together, in view of the manifest purpose of the act, we are of opinion that the wine in question was not manufactured by Harris either *at* or *in* his *bona fide* home, and hence was unlawful. His possession of it being unlawful, his transportation thereof was also unlawful.

There was no error in the instructions given by the trial court.

Other questions of minor importance were discussed, but do not require consideration.

We find no error in the proceedings of the trial court, and its judgment will be affirmed.

*Affirmed.*