Ross J. WOOD, Plaintiff-Appellant,

v.

NEW YORK LIFE INSURANCE COMPANY, Defendant-Appellee.

CONNECTICUT GENERAL LIFE INSURANCE COMPANY, Plaintiff-Appellee,

v.

Ross J. WOOD, Defendant-Appellant.

DELAWARE AMERICAN INTERNATIONAL LIFE INSURANCE COMPANY, Plaintiff-Appellee,

v.

Ross J. WOOD, Defendant-Appellant.

Nos. 84–8136, 84–8184 and 84–8185.

United States Court of Appeals, Eleventh Circuit.

March 3, 1986.

Richard P. Decker, Robert A. Moss, Atlanta, Ga., for Ross J. Wood.

H. Sanders Carter, Jr., Atlanta, Ga., for New York Life Ins. Co.

Thomas E. Magill, H. Sanders Carter, Jr., Douglas N. Campbell, Atlanta, Ga., for Connecticut Gen. Life Ins. Co.

Douglas N. Campbell, H. Sanders Carter, Jr., Atlanta, Ga., for Delaware American Intern. Life Ins. Co.

Before VANCE and ANDERSON, Circuit Judges, and PITTMAN *, Senior District Judge.

---

* Honorable Virgil Pittman, Senior U.S. District

Judge for the Southern District of Alabama, was

PER CURIAM:

Because these appeals are controlled by questions of Georgia law that were unsettled when the cases previously were considered by this court, the questions were certified by this court to the Supreme Court of Georgia. *Wood v. New York Life Ins. Co.,* 758 F.2d 1459 (11th Cir.1985). Its appended response establishes that the judgments of the district court in all three cases were correct. Accordingly, they are

AFFIRMED.

## APPENDIX

### No. 42341.

In the Supreme Court of Georgia.

Decided: Dec. 4, 1985.

### WOOD v. NEW YORK LIFE INSURANCE CO. et al.

BELL, Justice.

This case comes before us upon questions certified by the United States Court of Appeals for the Eleventh Circuit pursuant to Rule 36 of the Supreme Court of Georgia. See OCGA § 15-2-9. The following statement of facts and certified questions were submitted to us by the circuit court.

### Statement of Facts

"On January 13, 1982, Kristofer Wood died at the age of twenty-two of respiratory failure resulting from his lifelong affliction with muscular dystrophy. Kristofer was first diagnosed as having muscular dystrophy around 1966 when he was six years old. In 1969 his father, Ross Wood, began taking out insurance on Kristofer's life augmenting the coverage with increasing frequency during the five years immediately preceding Kristofer's death. At Kristofer's death, his father had accumulated policies from fifteen different insurance companies insuring Kristofer's life in excess of $500,000.00. All the policy appli-

cations contained specific questions regarding long-term illnesses and treatment, however, Ross Wood never disclosed that Kristofer suffered from muscular dystrophy. These three cases arose after Ross Wood attempted to recover on the policies issued by New York Life, Connecticut General Life and Delaware American International Life. [Fn. omitted.] In all three cases, following cross-motions for summary judgment, the district court granted summary judgment in favor of the insurance companies.

"The three cases differ somewhat factually, however, they share many common elements and their resolutions are dependent upon the two questions certified below. In all three cases Ross Wood signed Kristofer's name to the various applications for insurance. He asserts that he did so with Kristofer's consent, an assertion accepted as fact for summary judgment purposes. Section 33–24–6(a) of the Georgia Code Annotated requires that an insured either sign the application for insurance or consent in writing to its issuance. [Fn. omitted.] The insurance companies assert that since Kristofer did not sign the application or consent to them in writing, they are void *ab initio.*"

"Ross Wood contends that § 33–24–6(a) is not applicable in these cases because the policies involved are 'contract[s] of group life insurance' and thus excepted from the statute's requirements. Wood argues that several items in the record support this contention. First, the certificates of insurance issued by New York Life and Connecticut General state unequivocally on their faces that they are group policies. Second, an undated letter from the Administrator of the Connecticut General Group Life Plan notified Kristofer that he could increase his group coverage by signing and returning the letter to Connecticut General. Last, Wood points out that in her deposition Ms. Palma Cronk, who is a consultant for New York Life, responded affirmatively to the following question—'I take it then that it

a member of the panel. Subsequent to the certification of this case to the Supreme Court of Georgia, Judge Pittman disqualified himself

from further participation in the case. This final opinion is rendered for the court by a quorum of the panel. 28 U.S.C. § 46(d).

was a group insurance program as opposed to some other kind of insurance?'

"The insurance companies acknowledge the foregoing, however, they contend that the policies involved here are not the type of 'true group' policies which are intended to be excepted from the provisions of § 33–24–6(a). To support their contention they point out that the purpose of the requirement that an insured sign the application or consent in writing to its issuance is to protect the insured. The rule is designed to keep an individual from unknowingly becoming worth more dead than alive to a potential beneficiary. Group policies are excepted under § 33–24–6(a) because under a 'true group' policy the party who takes out the insurance cannot be the beneficiary. *See* Ga.Code Ann. § 33–27–1 (Supp.1984). The insurance companies argue that since the party taking out the insurance here, Ross Wood, could have been and was in fact the named beneficiary, the group policy exception should not be applicable. They assert that any other interpretation prevents the statute from accomplishing its goal—protection of the insured. After examining the certificates in question and analyzing the applicable Georgia law, the district court agreed with the insurance companies and concluded that the policies were 'franchise' rather than 'true group' policies and therefore held that § 33–24–6(a) was applicable. Since Kristofer had not signed the applications or consented to their issuance in writing, the court held that all the contracts were void *ab initio*.

"Wood further contends that even if § 33–24–6(a) does apply to the policies, the insurance companies are barred from raising the defense that Kristofer failed to sign the applications or consent to their issuance in writing because each of the policies contained an incontestability clause, as mandated by Ga.Code Ann. § 33–27–3(a)(2), [fn. omitted], which imposed a two year time limit for raising policy-validity defenses. All three of the insurance companies issued their initial policies on Kristofer's life more than two years prior to his death. New York Life issued its initial policies on October 1, 1978, and March 3, 1979, Connecticut General issued its initial policy on November 1, 1978, and Delaware American issued its initial policy on July 1, 1979. The coverage under each of the policies was raised and new certificates of insurance were issued at least once within the two years immediately preceding Kristofer's death. New York Life raised its coverage and issued new certificates for the final time on March 25, 1981 and April 28, 1981. Connecticut General raised its coverage and issued a new certificate for the final time on February 23, 1981. [Fn. omitted.] Delaware American raised its coverage and issued its final certificate of insurance on September 1, 1981. Wood contends that since the initial policies were all issued more than two years prior to Kristofer's death, the insurance companies are now barred by the incontestability clauses from raising the void *ab initio* defense. The insurance companies contend that the incontestability clauses are inapplicable since the policies were void *ab initio* and thus never in effect. In the alternative, they contend that the effective date of each certificate of insurance is its date of issuance and that since all the final certificates were issued within two years of Kristofer's death, the incontestability clauses do not bar their present claims. The district court again agreed with the insurance companies and concluded that the incontestability clauses were not applicable since the contracts were void *ab initio*."

## Certified Questions

1. "Whether the policies issued by New York Life Insurance Company, Connecticut General Life Insurance Company and Delaware American International Life Insurance Company on the life of Kristofer L. Wood are 'contract[s] of group life insurance' within the meaning of Ga.Code Ann. § 33–24–6(a) and thus excepted from the requirement that the insured either sign the application for insurance or consent in writing to its issuance?"

2. "Whether the two year time limit imposed by the policies' incontestability

clauses in compliance with Ga.Code Ann. § 33–27–3(a)(2) bars the insurance companies from now raising the defense that Kristofer neither signed the applications for insurance nor consented in writing to their issuance?"

1. Before answering the first certified question regarding OCGA § 33–24–6(a),[1] we undertake to examine the arrangements established to obtain insurance from the insurance companies. For our purposes, an examination of one such arrangement will suffice.

On June 25, 1964, New York Life issued Group Policy No. G–9400 to the Trustee of Engineering Associations Insurance Trust (hereinafter the Trust), as policyholder. By virtue of the issuance of the group policy, the Trust granted to New York Life the right to offer members of certain organizations participating in the trust the opportunity to apply for life insurance coverage. Such organizations included the American Academy of Political and Social Science and the Operations Research Society of America. All applicants were required to submit evidence of insurability satisfactory to New York Life, and all such applications were considered by New York Life and accepted or rejected on an individual basis in accordance with company underwriting standards. After approving an applicant, New York Life would then issue the applicant a certificate of insurance in an agreed upon amount.

Having given this background information we turn to the question of whether the policies issued by the insurance companies fall within the purview of OCGA § 33–24–6(a), so as to be subject to the requirement that the insured sign the application for insurance or consent in writing to its issuance. In the Connecticut General case the district court, Chief Judge Charles A. Moye, Jr., thoroughly reviewed the issue and concluded that the policy, for purposes of OCGA § 33–34–6(a), was not a group policy and that it was therefore subject to the requirements of OCGA § 33–24–6(a). In the New York Life and Delaware American cases, it relied on its reasoning in the Connecticut General case to reach the same result. As we are in complete agreement with the district court's treatment of this issue, we quote in relevant part from its order in the Connecticut General case:

"A careful review of the public policy considerations which underlie the statute [OCGA § 33–24–6(a)] and of the nature of the Connecticut General coverage leads to the conclusion that the statute is applicable. The cardinal rule of statutory construction is to ascertain the legislative intent and purpose in enacting a law and then give it the construction that will effectuate the legislative intent and purpose. *Hollowell v. Jove,* 247 Ga. 678, 279 S.E.2d 430 (1981). In determining the intention of the legislature in enacting a particular statute, the Court should look to the old law and to the evil which the legislature sought to correct. *Barton v. Atkinson,* 228 Ga. 733, 187 S.E.2d 835 (1972).

"In the early common law, there was no requirement that the owner of a life insurance policy have an insurable interest in the life of the insured, nor was there any requirement that the insured consent to the coverage on his life. The statutory requirement of insurable interest was intended to prevent wagering on human lives. The insurable interest requirement is inbred with a potential conflict of interest when one with an insurable interest obtains coverage on the insured without the insured's consent. The conflict is that the beneficiary of the policy has both an interest in the insured's continued life (the insurable interest) and an interest in the insured's death (as beneficiary of the policy). *See* W.F. Meyer, Life & Health Insurance Law § 4.6 (1972). As expressed by the court in *Metropolitan Life Insurance Co.*

1. OCGA § 33–24–6(a) provides that "[n]o life or accident and sickness insurance contract upon an individual, except a contract of group life insurance or of group or blanket accident and sickness insurance, shall be made or effectuated unless at the time of the making of the contract the individual insured, being of competent legal capacity to contract, applies for a life or accident and sickness insurance contract or consents in writing to the contract,..."

*v. Smith,* 122 Ky. 868, 59 S.W. 224 (1900), this conflict might be a fruitful source of crime. At the very least, it creates a substantial risk to the unknowing insured person.

"As in other cases of conflict of interest, the consent of the party who would be affected by the conflict of interest obviates the public concern since the affected party can best evaluate the risk to his own interest. In the context of life insurance, it was recognized early in our jurisprudence that it is against public policy to procure insurance on the life of another without his consent, even though the insurance was procured by one having an insurable interest. *See e.g., Byrne v. Prudential Insurance Company of America,* 88 S.W.2d 344 (Mo.1935). *See also* 44 C.J.S. Insurance § 241.

"Section 33–24–6(a) of the Official Code of Georgia Annotated (Ga.Code Ann. § 56–2407) is an expression of the public policy of Georgia and is an extension of the common law rule that a valid policy of insurance may not be issued on the life of an adult without the knowledge and consent of the person insured. 44 C.J.S. Insurance § 241. The reason is to avoid extending to the beneficiary the temptation to hasten by improper means the time when he will receive the benefits of the policy. Insurance contracts which violate this common law rule are against public policy and are void, and no court will concern itself with the enforcement of such a contract. *See Gordon v. Gulf American Fire & Casualty Co.,* 113 Ga.App. 755, 149 S.E.2d 725 (1966).

" 'While the policy at common law dealt with "knowledge or consent," the Georgia Legislature has been even more restrictive by providing that the insured must either apply for the insurance or consent thereto *in writing.*' *Wren v. New York Life Insurance Co.,* 59 F.R.D. 484 (N.D.Ga.1973), *aff'd* 493 F.2d 839 (5th Cir.1974) (emphasis by the court). The reason for the rule was explained by the Court of Appeals at 493 F.2d 841:

It logically follows that the purpose of the statute is to put the consent beyond all question by requiring it to be in writing. Likewise, the very purpose and specific requirement of the statute would be rendered meaningless if one could meet its terms by alleging consent to have been verbally authorized, something that the deceased insured would hardly be in a position to dispute.

"These public policy considerations, as well as the rationale of *Wren,* apply with equal force to Kristofer's coverage under the type of group policy issued by Connecticut General and to his coverage under various individual policies.... In each instance, Wood filled out the application, naming himself as beneficiary and signing his son's name allegedly with Kristofer's permission. Nevertheless, the statute appears to except a 'contract of group life insurance.' Understanding the rationale for this exception reveals that it is inapplicable to the present case.

"The type of group policies authorized in Georgia are defined in O.C.G.A. § 33–27–1 (Ga.Code Ann. § 56–2701). Subsection (1) permits a group policy to be issued to an employer insuring his employees 'for the benefit of persons other than the employer.' Subsections 4 (Labor Unions), 5 (Trustee Groups) and 6 (Association Groups) contain nearly identical language precluding the group policyholder from procuring insurance on its members for the benefit of the group policyholder. *In each instance, the group insurance must be for the benefit of someone other than the group itself. Since such a group, by statute, cannot be the beneficiary of the insurance on its members, there is no potential for wrongdoing nor any conflict of interest in permitting the group to procure life insurance on its members without their consent. Cf. Whitestone General Hospital v. IntraAmerica Life Insurance Co.,* 60 Misc.2d 656, 303 N.Y. S.2d 589 (1969), *aff'd* without opinion [35 A.D.2d 782] 315 N.Y.S.2d 816 (holding that, since a partnership was named beneficiary of insurance on the life of a partner, the policy was not a group life policy and, therefore, was not exempt from the statute

requiring the insured's application or written consent).

"The circumstances of the instant case do not fall within the intended scope of the exception. In this case, each application for insurance on Kristofer's life was submitted to the insurer for an individual determination whether to accept the risk. More importantly, it was not the group policyholder who sought to procure insurance coverage on Kristofer without his consent; rather, Wood completed the applications and initiated the insurance. Wood, unlike the group policyholder, was not prevented from naming himself beneficiary on the policies, and he did so allegedly by direction of Kristofer. In these circumstances, the necessity for the written consent of the insured is patent and falls within the general requirement of § 33–24–6(a) rather than the exception for a 'contract of group insurance.'

"This construction of § 33–24–6(a) effectuates the intention of the legislation in enacting that section. The intention of the legislature must be carried out, even though the literal sense of the terms used in the statute may appear to be different from the clear intent. *State v. Livingston,* 222 Ga. 441, 150 S.E.2d 648 (1966). Here, that legislative intent becomes evident when the nature of 'group insurance' is examined. In *McFarland v. Business Men's Assurance Co. of America,* 105 Ga. App. 209, 124 S.E.2d 432 (1962), the court defined group insurance: 'Group insurance is the coverage of a number of individuals by means of a single or blanket insurance policy. In group insurance employees do not make individual applications, and they receive certificates referring to the master policy which is issued to the employer.' By limiting the exception for group insurance in § 33–24–6(a) to the type of 'true group' insurance defined in *McFarland,* the evil that the statute was designed to remedy is eliminated and the legislative purpose is effectuated.

"Additionally, the coverage extended to Kristofer is not 'true group' insurance, but is 'franchise' insurance, ... a type of coverage having some similarities both to group insurance and to individual policies. As described in 1 Appleman, Insurance Law and Practice § 54 at 178:

The term 'franchise' comes from the fact that by accepting a master policy the governing entity of the association or other organization grants a franchise to the insurer to solicit its members, or other personnel, and places a qualified stamp of approval upon its plan. Ordinarily, it will permit its official letterhead to be used upon communications to the members and often an article, or advertising, will appear in its official publication to the effect that such is an 'approved' or 'sponsored' plan. The holder of the master policy and the insurer may negotiate for modification in the terms of the coverage and even agree to its termination, but not without keeping the certificate holders apprised of any changes which are made. With that qualification, *the situation is precisely that of an insurer dealing directly with its policyholders,* and each insured has independent rights against the insurer which are exactly the same as if there were no other contracts existing between such company and the organization or other members. (Emphasis added.)

Contracts of insurance written on the franchise plan 'bear the same legal consequences as any individually written policy.' *Id.* at 181. As a consequence, the necessity for the signature of the individual insured, as required by O.C.G.A. § 33–24–6(a), is exactly the same under a franchise plan as under an individual policy...."

2. As we are in agreement with the district court that the policies in question are subject to the requirements of OCGA § 33–24–6(a), we must now decide the second certified question. It raises the issue of whether the insurance companies are barred by the policies' two-year incontestability clauses from now raising the defense that Kristofer neither signed the applications for insurance nor consented in writing to their issuance.

The incontestability clauses are in compliance with OCGA § 33–27–3(a)(2), which provides that policies must contain "[a] provision that the validity of the policy shall not be contested, except for nonpayment of premiums, after it has been in force for two years from its date of issue and that no statement made by any person insured under the policy relating to his insurability shall be used in contesting the validity of the insurance, with respect to which the statement was made, after the insurance has been in force prior to the contest for a period of two years during such person's lifetime nor unless it is contained in a written instrument signed by him[.]"

At the outset we note that, as should be apparent from Division 1, supra, the failure of Kristofer Wood to sign the policies or consent in writing to their issuance renders the policies void *ab initio* as against the policy of the law of this state. See *Wren v. New York Life Insurance Co.*, 493 F.2d 839 (5th Cir.1974); *Alleman v. Lincoln National Life Insurance Co.*, 636 F.2d 1195 (10th Cir.1981); *Rash v. Toccoa Clinic Medical Associates*, 253 Ga. 322(1), 320 S.E.2d 170 (1984). The issue then is whether, as Wood contends, the defense that the contract of insurance is void *ab initio* is subject to the incontestability clause, such that that defense cannot be raised after the policy has been in force for two years. We find that that defense is not subject to the incontestability clause.

First, we turn to the express language of OCGA § 33–27–3(a)(2) and of the incontestability clauses in the policies at issue, which provide, in essence, that after a policy has been "in force" for two years its validity cannot be attacked. The incontestability clauses, therefore, presuppose the existence of a contract "in force." However, an insurance contract that is void *ab initio* as against public policy is never "in force," cannot be ratified or affirmed, and is not subject to being enforced by the courts. *Gordon v. Gulf American Fire and Casualty Co.*, 113 Ga.App. 755, 760, 149 S.E.2d 725 (1966); *Wilson v. Progressive Life Insurance Co.*, 61 Ga.App. 617, 618, 7 S.E.2d 44 (1940).

Second, at least one court has addressed the issue of whether an incontestability clause prohibits an insurer from raising the defense that a contract was void at its inception. *Obartuch v. Security Mutual Life Insurance Co.*, 114 F.2d 873 (7th Cir. 1940); see generally, 1A Appleman, Insurance Law and Practice, § 337 (1981). In *Obartuch*, supra, 114 F.2d at 878, the court held that "[i]t would serve no good purpose to review the many cases relied upon by the plaintiff where the courts have held, under a variety of circumstances, the incontestable clause to be a bar after the expiration of the time mentioned therein. Such cases are distinguishable on the ground that the contract was voidable, subject to be cancelled and not void as in the instant case. The purpose of such provision is to assure that after the expiration of the time fixed thereby, neither the insured nor his beneficiary will be subjected to a claim of fraud made by the insurer. Within that time, however, the insurer is given the opportunity to investigate, and if fraud is discerned, to take action to rescind the contract.

"The clause itself, however, presupposes a valid contract and not one void ab initio— it cannot be used as a vehicle to sanctify that which never existed."

We agree with the *Obartuch* decision. To reach a contrary conclusion would permit the unreasonable result that an incontestability clause would breathe life into an insurance contract which the General Assembly intended to have no life, and would frustrate the strong public policy that no contract for life insurance should be made unless the insured applies for or consents in writing to the contract. This we decline to do.

Accordingly, we hold that the incontestability clauses contained in the policies in issue do not bar the insurance companies from raising the defense that Kristofer neither applied for nor consented in writing to the insurance contracts.

*Certified Questions Answered.*

All the Justices concur, except GREGORY, J., who dissents.

GREGORY, Justice, dissenting.

Notwithstanding the factual statement showing the son's life was insured for a large sum of money, and allegations of the father's failure to disclose his son's illness to the insurers, in my view the only issue we must resolve is the consequence to be attached to the father's failure to obtain the *written* consent of his son to sign the son's name to the applications for insurance. On this appeal it is without dispute the consent was obtained, but only orally and not in writing. The statute [OCGA § 33–24–6(a)] requires a writing. I would hold the failure to obtain a writing does not render the contracts of insurance void "ab initio." Therefore, the two year incontestability clause applies so as to bar the defense.