SYLVIA DANIELS, Appellant, v. NATIONAL HOME LIFE ASSURANCE CO., a Pennsylvania Corporation, Respondent.

No. 17990

December 31, 1987                                      747 P.2d 897

*Wehrmeister & Gonzales,* Las Vegas, for Appellant.

*Edwards, Hunt, Hale & Hansen* and *Travis C. Williamson,* Las Vegas, for Respondent.

## OPINION

*Per Curiam:*

In February of 1983, William Daniels, a Nevada resident, mailed an application for life insurance to the administrative offices of respondent National Home Life Assurance Company (National) in Pennsylvania. Mr. Daniels, a veteran and retired postal worker, apparently applied for the insurance in response to a nationally broadcast television commercial advertising low cost life insurance to qualified veterans of the United States armed forces. National approved his application for $30,000 in life insurance, and issued a certificate to Mr. Daniels indicating coverage under a group term life insurance policy effective May 1, 1983. Appellant Sylvia Daniels, William Daniels' wife, was the named beneficiary.

National sent Mr. Daniels the certificate of coverage plus a copy of the master policy. The policy specified that it was delivered in Missouri to the policyholder, United Missouri Bank

of Kansas City, N.A., Trustee for the Veterans Group Insurance Trust, with an effective date of February 1, 1979. The following language appeared on the front page of the policy in small print: "This Policy is delivered in the situs shown above and is governed by its laws." Additionally, Mr. Daniels' certificate stated that he was insured "subject to the timely payment of premium[s]," and provided for termination of coverage upon failure to make the required premium payment, subject to a thirty-one day grace period.

Pursuant to the policy, Mr. Daniels began paying quarterly premiums of $133.38. On November 8, 1983, Mrs. Daniels mailed National a check for the third quarterly premium payment. The check was subsequently returned unpaid to National due to insufficient funds in the Daniels' account. When National resubmitted the premium check, it was again dishonored for insufficient funds. When the premium was not paid within the grace period, National canceled the insurance without notifying the Daniels of either the termination of coverage or the failure to pay the premium when due.

On January 4, 1984, Mr. Daniels was killed in a robbery/homicide in Las Vegas. Mrs. Daniels promptly submitted a claim to National for benefits under the policy. In response, she received a letter stating that her husband's policy had lapsed because the November premium had not been paid. This was her first notice regarding the delinquent payment and cancellation. National later mailed the premium check to Mrs. Daniels with a letter informing her that the policy had been backdated to November 1, 1983. Both letters emanated from National's administrative offices in Pennsylvania.

Mrs. Daniels subsequently commenced an action in Nevada against National. She alleged claims for breach of contract and for bad faith denial of her claim on the basis that National's cancellation of the life insurance was ineffective absent proper notice of termination of the policy. National moved for summary judgment on grounds that the policy had lapsed due to the nonpayment of premiums, and that, under the Missouri law governing the policy, no notice of termination was required before cancellation of the policy became effective. The district court granted the motion, and this appeal followed.

Mrs. Daniels contends that a genuine issue of fact precluded the district court from entering summary judgment. Specifically, she argues that pursuant to Nevada's choice-of-law principles, the district court could not give effect to the stipulation in the policy that Missouri law governed without first deciding the factual question of whether Missouri had a substantial relationship to the transaction between Mr. Daniels and National.

In Sievers v. Diversified Mtg. Investors, 95 Nev. 811, 815, 603 P.2d 270, 273 (1979), we stated:

> Under choice-of-law principles, parties are permitted within broad limits to choose the law that will determine the validity and effect of their contract. . . . The situs fixed by the agreement, however, must have a substantial relation with the transaction . . . and the agreement must not be contrary to the public policy of the forum. (Citations omitted.)

Because we decide that the insurance contract violates the public policy of Nevada, we need not address the issues raised by Mrs. Daniels.

The legislature has expressly stated the purposes behind the enactment of the Insurance Code. *See* NRS 679A.140. These purposes include protecting those with interests under insurance policies, insuring that policyholders, claimants and insurers are treated fairly and equitably, and preventing misleading, unfair and monopolistic practices in insurance operations. *Id.* The provisions of the Insurance Code must be reasonably and liberally construed in order to fulfill these purposes. NRS 679A.140(2).

[Headnote 1]

NRS 687B.320 is designed to protect individuals from the arbitrary actions of insurers who cancel insurance policies without notice to their insureds.[1] By enacting this provision, the legislature determined that individuals must be afforded notice that their insurance is about to lapse, in order to avoid the tragedy that fell upon the Daniels here. This state's overriding concerns of protecting its citizens and insuring that they are afforded fair and equitable treatment by insurers, lead us to conclude that an insurance contract which does not provide for notice prior to termination for failure to pay a premium when due, unless expressly excluded by statute from the application of NRS 687B.320, is against the public policy of Nevada and thus is unenforceable.

We are not persuaded by National's argument that the policy in question is a group policy which should be governed by the law

---

[1]NRS 687B.320 provides, in pertinent part:

1. No insurance policy that has been in effect for at least 70 days or that has been renewed may be canceled by the insurer prior to the expiration of the agreed term or 1 year from the effective date of the policy or renewal, whichever is less, except on any one of the following grounds:

(a) Failure to pay a premium when due; . . .

2. No cancellation under subsection 1 shall be effective until in the case of paragraph (a) of subsection 1 at least 10 days . . . after the first class mailing or delivery of a written notice to the policyholder.

of Missouri, the state in which the master policy was delivered. Although veterans may be a group, "group policies" are directed at a limited number of persons affiliated with an organization. *See* NRS 688B.030. The policy National issued ·to Mr. Daniels appears to be "franchise insurance," which is to be treated as an individual policy. *See* J. Appleman, *Insurance Law and Practice,* § 54 (1981); Wood v. New York Life Ins. Co., 336 S.E.2d 806 (Ga. 1985). Significantly, the cases National cites in support of its position do not involve such a diverse group as veterans, but concern either employees of a single employer, or recognized professional organizations such as the American Dental Association. In a typical group policy made available through an employer as an employee benefit, the employer provides a buffer between the insurer and the insured. The employer usually negotiates terms for the group to lessen any arbitrary provisions in the master contract. Also, the employer assures that the policy will remain in force, often provides information concerning coverage to its employees, collects premiums, and resolves any disputes with the insurer. Where, as here, there is no employer or organization to negotiate on behalf of the insured and provide a buffer against overreaching by the insurer, it is all the more compelling to construe NRS 687B.320 in a manner which affords the greatest protection to the insured.

National also argues that even if we apply Nevada law to the contract, it was not required to give the Daniels notice of termination because the master policy was delivered in Missouri, and not in Nevada. We disagree. NRS 687B.010(2) excludes from the application of NRS Chapter 687B "[p]olicies or contracts not issued for delivery in this state nor delivered in this state." National sent to Mr. Daniels not only a certificate of coverage, but also a copy of the master policy. A copy of an insurance policy which is mailed to this state is clearly "delivered in this state" within the meaning of NRS 687B.010(2). If the statute under consideration is clear on its face, we cannot go beyond it in determining legislative intent. *See* Cirac v. Lander County, 95 Nev. 723, 602 P.2d 1012 (1979). Hence, NRS 687B.010 does not operate to exempt the policy here in issue from the notice provisions of NRS 687B.320.

Reversed and remanded for further proceedings consistent with this opinion.[2]

STEFFEN, A. C. J., and YOUNG, SPRINGER; and MOWBRAY, JJ., concur.

---

[2]THE HONORABLE E. M. GUNDERSON, Chief Justice, voluntarily disqualified himself from participation in this case. Nev. Const., art. 6, § 4.