Present:  All the Justices

JAMES A. HILFIGER

v.  Record No. 980074    OPINION BY JUSTICE ELIZABETH B. LACY
                                    September 18, 1998
TRANSAMERICA OCCIDENTAL LIFE
INSURANCE COMPANY

       UPON QUESTIONS OF LAW CERTIFIED BY THE UNITED STATES
              COURT OF APPEALS FOR THE FOURTH CIRCUIT

       Pursuant to our Rule 5:42, the United States Court of

Appeals for the Fourth Circuit certified three questions of

Virginia law to this Court regarding the enforceability of a

life insurance policy.  The questions involve the application

of Va. Code §§ 38.2-302 and -319.  We accepted the questions

by order entered February 13, 1998.

       The facts, as presented in the certification order, are

as follows.[*]  On January 28, 1995, James A. Hilfiger (Hilfiger)

filled out an application for a life insurance policy with

Transamerica Occidental Life Insurance Company (Transamerica)

seeking insurance upon the life of his father, Paul L.

Hilfiger.  On the application form, Hilfiger answered all

questions on his father's behalf, and where the form required

the "signature of proposed insured," Hilfiger signed his

father's name.  Deborah C. Highsmith, a Licensed Resident

_____

       [*] Because the federal district court granted summary
judgment in favor of Transamerica Occidental Life Insurance
Company, the facts are presented in the light most favorable

Agent of Transamerica, signed the application as a "witness to all signatures." Highsmith knew that Hilfiger was signing the application on behalf of his father.

Hilfiger's father did not see the life insurance application, nor did he give Hilfiger written consent to sign his name. However, Hilfiger claims that he spoke to his father about the policy, and that his father gave him oral authorization to take out the policy. The application named Hilfiger as the sole beneficiary for the policy.

In May 1995, Hilfiger's father underwent a medical examination in connection with the life insurance application. At the medical examination, Hilfiger's father signed a form entitled "PART II of an Application for Insurance to the Transamerica Occidental Life." This form did not identify the type of insurance applied for, who the proposed beneficiary was, or the amount of coverage sought. Transamerica issued the insurance policy on October 9, 1995.

On November 13, 1995, Hilfiger's wife, Donna C. Hilfiger, became a broker for Transamerica. Shortly thereafter, she executed an amendment to the insurance policy as a Transamerica resident agent. As with the original application, Hilfiger signed his father's name to the form.

---

to Hilfiger. United States v. Leak, 123 F.3d 787, 794 (4th Cir. 1997).

Hilfiger's father did not see the document, but Hilfiger asserts that he discussed the amendment with his father. Nine days after the amendment was executed, Hilfiger's father became ill. He died four days later on December 3, 1995.

Transamerica refused to pay the proceeds of the life insurance policy. Hilfiger filed a motion for judgment against Transamerica in the Circuit Court of the City of Virginia Beach seeking the proceeds of the policy, additional damages, and costs. Transamerica removed the case to the United States District Court for the Eastern District of Virginia and later filed a motion for summary judgment. The federal district court granted Transamerica's summary judgment motion, concluding that the execution of the policy did not comply with Code § 38.2-302 and, therefore, was void. Hilfiger appealed to the Court of Appeals.

In certifying the questions to this Court, the Court of Appeals stated that the answers would be determinative of the proceeding pending before it. We address the three questions in order.

I.

The Court of Appeals first asks:

Whether the son's signing his father's name as "proposed insured" violates Va. Code § 38.2-302, where the son discussed the policy with his father, had verbal authorization to apply for the policy, and his father later submitted to a medical

3

examination and signed a form entitled "PART II of an Application for Insurance to the <u>Transamerica Occidental Life</u>?"

At common law, a policy of insurance taken out on the life of an insured without the insured's knowledge or consent by someone other than the insured was usually held void as against public policy.  1 Bertram Harnett & Irving I. Lesnick, <u>The Law of Life and Health Insurance</u> § 3.04[1][a] (1997).  The reason for this rule was the risk to the insured that a beneficiary would be tempted to "hasten by improper means the time when he will receive the benefits of the policy."  <u>Wood v. New York Life Ins. Co.</u>, 336 S.E.2d 806, 809 (Ga. 1985); <u>Hopkins v. Hopkins</u>, 614 A.2d 96, 100 (Md. 1992).

Code § 38.2-302(A) codifies this common law principle, stating in pertinent part that:

> No contract of insurance upon a person shall be made or effectuated unless at the time of the making of the contract the individual insured, being of lawful age and competent to contract for the insurance contract (i) applies for insurance, or (ii) consents in writing to the insurance contract.

The statute provides the requisite protection for an insured by identifying two alternative conditions for creating a valid contract of life insurance.  The specific conditions identified by the General Assembly reflect an intent to require unequivocal evidence that an insured approved the creation of a contract of insurance on his or her life.  With

4

this purpose in mind, we conclude that the facts in this case, as recited in the certification order, do not establish proof of either condition.

First, the evidence in this case, that Hilfiger's father knew about the policy and orally authorized Hilfiger to apply for the policy, does not constitute an application for the policy by the insured as required by the statute.

At one time, the insured's knowledge of the policy alone was sufficient to establish compliance with the requirements of the Code. Former Code § 38.1-330, the predecessor to Code § 38.2-302, provided in relevant part that "[n]o contract of insurance upon the person . . . shall be made or effectuated unless . . . the individual insured . . . applies therefor, has knowledge thereof, or consents thereto . . . ." In 1986, however, the General Assembly eliminated the phrase "has knowledge thereof," leaving the two current alternative conditions as the only means of creating a valid contract of life insurance. Acts 1986, ch. 562.

We also conclude, as Hilfiger acknowledges, that orally authorizing another to take out a policy does not alone constitute "applying" for the policy. If oral authorization alone were enough to satisfy the application requirement, the written consent alternative would be rendered superfluous.

5

<u>Wren v. New York Life Ins. Co.</u>, 493 F.2d 839, 841 (5th Cir. 1974)(interpreting a similar statute).

Nevertheless, Hilfiger asserts that the application prong of the section was satisfied in this case because his father "materially participated" in the application process by providing a medical history and submitting to a medical examination.  We disagree.  "Material participation" in the application process is not synonymous with <u>applying</u> for the policy.  As we have said, the purpose of the conditions required for a valid contract of life insurance is to eliminate any doubt that the insured knew about and agreed to the issuance of the insurance contract.  Here, providing medical information in conjunction with the issuance of an insurance policy did not reflect consent to the contract of insurance.

For the same reason, we reject Hilfiger's contention that his father's signature on the medical examination form qualified as a consent in writing to the insurance contract. The insured's signature on the medical form affirmed only that the information provided on the form was correct.  Although the form itself stated that it was a part of an application for insurance, it contained none of the terms of the contract. It was not, and could not have been, a written consent "to the insurance contract" as required by Code § 38.2-302.

6

For these reasons, we conclude that the facts of this case do not satisfy either alternative required by Code § 38.2-302 for the creation of a valid contract of life insurance. Accordingly, we answer the first question in the affirmative.

II.

In the second certified question the Court of Appeals asks:

> Whether the insurance policy should be enforced on behalf of the beneficiary despite the violation of § 38.2-302, in light of Virginia Code § 38.2-319's provision that "[a]ny insurance contract made in violation of the laws of this Commonwealth may be enforced against the insurer?"

We answer this question in the negative. If Code § 38.2-319 required enforcement of a policy issued in violation of Code § 38.2-302, the protection for an insured intended by Code § 38.2-302 could never be realized, and Code § 38.2-302 would be meaningless. Code § 38.2-319 does not compel such a result.

By its own terms, Code § 38.2-319 applies to a contract of insurance which is "made" in violation of a law of the Commonwealth. Code § 38.2-302 declares that if the statutory requirements are not met, no life insurance policy can be "made or effectuated." Thus, in the absence of compliance with the provisions of Code § 38.2-302(A), no contract of

7

insurance is created, and any policy issued under those circumstances must be void ab initio. Wood, 336 S.E.2d at 809, 811-12 (interpreting a similar statute). Contra Jackson Nat'l Life Ins. Co. v. Receconi, 827 P.2d 118, 131 (N.M. 1992).

Here, no contract of life insurance was "made or effectuated" because there was no compliance with Code § 38.2-302(A). Therefore, Code § 38.2-319 does not require enforcement of the insurance policy issued by Transamerica in this case.

### III.

Finally, the Court of Appeals asks:

> Whether an insurance company can be estopped to rely on § 38.2-302 because its agent knew about the incorrectness of the signature on the application?

Estoppel is an equitable principle that prevents one "whose action or inaction has induced reliance by another from benefiting from a change in his position at the expense of the other." Employers Commercial Union Ins. Co. of America v. Great American Ins. Co., 214 Va. 410, 412, 200 S.E.2d 560, 562 (1973). Hilfiger argues that Transamerica should be estopped from relying on Code § 38.2-302 to avoid payment on the life insurance policy because it is charged with the knowledge of its agents, both of its agents knew that the insured did not sign the application form, and both agents failed to inform

8

Hilfiger of the consequences of that omission.  This failure, Hilfiger asserts, prevented him from taking the appropriate corrective measures to secure a valid life insurance policy for his father.

We have addressed the application of equitable estoppel in the context of enforcing insurance policies against an insurer.  Id.; Reserve Life Ins. Co. v. Ferebee, 202 Va. 556, 118 S.E.2d 675 (1961); New York Life Ins. Co. v. Eicher, 198 Va. 255, 93 S.E.2d 269 (1956); Gilley v. Union Life Ins. Co., 194 Va. 966, 76 S.E.2d 165 (1953).  And, as Hilfiger points out, we have applied the doctrine to enforce an insurance policy based on imputing to the insurer its agent's knowledge of false statements on the application.  See Gilley, 194 Va. at 974, 76 S.E.2d at 170.  These cases all involved the level of knowledge and complicity of both the agent and applicant in supplying such false information.  None of these cases, however, involved consideration of whether the equitable doctrine of estoppel should be applied in a manner which negates a significant public policy codified by the General Assembly.

Jurisdictions addressing that situation have not been unanimous in their conclusions or rationales.  One court applied equitable estoppel based on the theory that the statutory requirements for a valid life insurance contract

9

reflect a public policy to protect the insured and the beneficiary, rather than to preserve the public order and morals and, therefore, the statutory requirements can be waived by the beneficiary.  Adam Miguez Funeral Home, Inc. v. First Nat'l Life Ins. Co., 234 So.2d 496, 499 (La. Ct. App. 1970).  Another court concluded that the failure to apply equitable estoppel under these circumstances would allow insurers to perpetrate a fraud upon policyholders by accepting premiums on a policy, knowing that the policy was void from the beginning.  Holmes v. Nationwide Mut. Ins. Co., 244 N.Y.S.2d 148, 153 (1963).

In contrast, equitable estoppel has not been applied in these circumstances on the theory that its application would invite beneficiaries and insurers' agents to create a binding contract of insurance on the life of another in direct contravention of the policy addressed by the common law and statutes in imposing requirements for a valid policy.  Hunt v. Pyramid Life Ins. Co., 732 S.W.2d 167, 169 (Ark. Ct. App. 1987); Time Ins. Co. v. Lamar, 393 S.E.2d 734, 735-36 (Ga. Ct. App. 1990).

We are persuaded that the better rationale is not to apply equitable estoppel to enforce a life insurance policy issued in contravention of Code § 38.2-302.  That statute was not enacted for the protection of the beneficiary but to

protect the insured against potentially improper motives of the beneficiary. Thus, contrary to the conclusion reached elsewhere, we conclude that a beneficiary is not entitled to waive the statutory requirements. As we have already stated, applying Code § 38.2-319 to enforce a contract which Code § 38.2-302 renders void ab initio eliminates the very purpose of the statute. To apply equitable estoppel in these circumstances also:

> would permit the unreasonable result that [the conduct of an insurance company or its agent] would breathe life into an insurance contract which the General Assembly [for reasons of individual and public protection] intended to have no life, and would frustrate the strong public policy that no contract for life insurance should be made unless the insured applies for or consents in writing to the contract.

Lamar, 393 S.E.2d at 736 (citing Wood, 336 S.E.2d at 812).

Accordingly, we answer the third certified question in the negative.

> First certified question answered in the affirmative.
> Second certified question answered in the negative.
> Third certified question answered in the negative.

JUSTICE KINSER, with whom JUSTICE KOONTZ joins, dissenting.

I would construe Code § 38.2-302(A) differently from the majority and would, therefore, answer the first certified question in the negative. I agree that the statute identifies "two alternative conditions" for making a valid life insurance contract, allowing a proposed insured either to apply for life

11

insurance or to consent to such a contract.  However, as I understand the majority's position, a proposed insured's oral authorization combined with "material participation" in the application process does not constitute "applying" for the insurance contract.  I disagree.[1]

The part of Code § 38.2-302(A) at issue provides that no life insurance contract is made or effectuated unless "the individual insured . . . (i) applies for insurance, or (ii) consents in writing to the insurance contract."  The statute fails to define "applies;" therefore, the term must be "given its ordinary meaning, given the context in which it is used." Dep't of Taxation v. Orange-Madison Coop. Farm Serv., 220 Va. 655, 658, 261 S.E.2d 532, 533-34 (1980).  "The context may be examined by considering the other language used in the statute."  City of Virginia Beach v. Bd. of Supervisors of Mecklenberg County, 246 Va. 233, 236-37, 435 S.E.2d 382, 384 (1993).

Examining the language chosen by the legislature, I find it significant that the phrase "in writing" appears after the disjunctive "or" and immediately following "consents" and that the two phrases, "applies for insurance" and "consents in

---

[1]  Notably, the majority states only what action is insufficient to apply for a life insurance contract and fails to delineate or define specifically the requirements necessary to apply for insurance under Code § 38.2-302(A).

writing," are separately identified by the designations "(i)" and "(ii)."  As a general rule, "proper grammatical effect will be given to the arrangement of words in a sentence of a statute," Harris v. Commonwealth, 142 Va. 620, 624, 128 S.E. 578, 579 (1925), and a presumption exists that the General Assembly understood basic rules of grammar when drafting the statute.  Frere v. Commonwealth, 19 Va. App. 460, 464, 452 S.E.2d 682, 685 (1995).  Fundamental rules of grammar require the placement of a phrase so as to indicate clearly what the phrase modifies.  John C. Hodges et al., Harbrace College Handbook 249 (12th ed. 1994).

Applying this rule to Code § 38.2-302(A), the phrase "in writing" modifies "consents," the word immediately preceding the phrase, and does not modify "applies."  But see Alleman v. Lincoln Nat'l Life Ins. Co., 636 F.2d 1195, 1196 (10th Cir. 1981) (holding that writing provision in Utah statute, which states that "[n]o life . . . insurance contract . . . shall be made . . . unless . . . the individual insured . . . in writing applies therefore [sic] or consents thereto," modifies not only "applies" but also "consents").  By choosing not to modify "applies" with the phrase "in writing," the General Assembly intended not to restrict the method by which an individual can apply for insurance.  See Forst v. Rockingham Poultry Mktg. Coop., Inc., 222 Va. 270, 278, 279 S.E.2d 400,

13

404 (1981) ("When the General Assembly uses two different terms in the same act, it is presumed to mean two different things.").  Moreover, when the General Assembly has intended for a proposed insured to apply for insurance in writing, it has so stated.  See Code § 38.2-3737(A) ("No contract of insurance upon a debtor shall be made or effectuated unless . . . the debtor . . . applies for the insurance in writing . . . .").  Thus, the General Assembly knows what language to use when it wants to condition the making of an insurance contract upon submission of a written application.

Therefore, in my view, under the provisions of Code § 38.2-302(A), consent to an insurance contract must be in writing, but the act of applying for insurance is not confined to any particular form.  In other words, the mode of applying for a life insurance contract is not limited to a written application personally signed by the proposed insured.  Accord Walker v. Jackson Nat'l Life Ins. Co., 20 F.3d 923, 924-25 (8th Cir. 1994) (holding that insured can apply for insurance without signing application).[2]

---

[2]    An example of a statute that plainly requires a written application signed by the insured is Mass. Gen. Laws Ch. 175, § 123 (1998).  This section states that "[n]o life company shall issue any policy of life or endowment insurance . . . except upon a written application therefor signed or assented to in writing by the person to be insured . . . ."

14

While rules of grammar are not permitted to defeat the purpose of a statute, Harris, 142 Va. at 624, 128 S.E. at 579, construing "applies" to denote more than the narrow meaning of an application signed by the proposed insured does not thwart the common law principle that Code § 38.2-302(A) embodies.  A proposed insured's signature on an application form is not critical to proving that the individual applied for insurance if other facts evidence the proposed insured's intent to apply.  See Walker, 20 F.3d at 925 (finding that signature of insured on insurance application was not crucial to proving his knowledge of policy and identity of beneficiary); Crump v. Northwestern Nat'l Life Ins. Co., 236 Cal. App.2d 149, 155 (1965) (holding insured's signature not essential where insured's agent prepared application and insured later ratified insurance contract).  In other words, if the facts show that the proposed insured acted with the purpose of obtaining life insurance, then no risk exists of "allowing one person to have insurance on the life of another without the knowledge of the latter."  Walker, 20 F.3d at 925.

In the instant case, the actions of Hilfiger's father show that he applied for insurance as contemplated by the provisions of Code § 38.2-302(A).  Because the district court granted summary judgment to Transamerica, the facts and inferences must be construed in the light most favorable to

Hilfiger.  United States v. Leak, 123 F.3d 787, 794 (4th Cir. 1997).  See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) ("at the summary_judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter").  The facts show that Hilfiger orally discussed the policy with his father and that the father verbally authorized his son to obtain the policy.  As the United States Court of Appeals for the Fourth Circuit stated in its certification order, "we can infer that the insured father 'authorized' Hilfiger to sign for him and provided the answers which Hilfiger filled in on the application forms."  Moreover, the father underwent a medical exam during which he signed a form titled "Part II of an Application for Insurance to the Transamerica Occidental Life."  Thus, the evidence shows not only oral authorization, but also undisputed overt actions on the part of the father that not only corroborate his oral authorization but also establish his participation in the application process.  This is not a case of mere oral authorization, which, as the majority observed, would render the written consent alternative superfluous.

Given these facts, I conclude that Hilfiger's signing his father's name as the "proposed insured" does not violate Code § 38.2-302.  As the majority stated, "[T]he purpose of the conditions required for a valid contract of life insurance is

16

to eliminate any doubt that the insured knew about and agreed to the issuance of the insurance contract." That purpose is fulfilled in this case.

Accordingly, for these reasons, I dissent.[3]

---

[3] Because I would answer the first certified question in the negative, I need not address the remaining two questions.