827 P.2d 118

JACKSON NATIONAL LIFE INSUR-ANCE COMPANY, Plaintiff-Ap-pellant and Cross-Appellee,

v.

Debrot RECECONI, Defendant-Appellee and Cross-Appellant,

and

Eugene W. Peirce, Jr., Defendant-Appellee.

No. 19498.

Supreme Court of New Mexico.

Feb. 24, 1992.

Rodey, Dickason, Sloan, Akin & Robb, Michael J. Condon, Albuquerque, for appellant.

Jones, Snead, Wertheim, Rodriguez & Wentworth, Steven L. Tucker, Santa Fe, for appellee Receconi.

Daniel J. O'Friel, Santa Fe, for appellee Peirce.

## OPINION

MONTGOMERY, Justice.

Decision of this appeal turns primarily on whether an express condition precedent in an application for a life insurance policy was waived by the insurance company through its soliciting agent. The condition required that the health of the insured remain as represented in the insured's application, which it did not; and the agent, with knowledge of the insured's deteriorated health, requested the first premium payment and forwarded it to the company, which thereafter retained it for several months. We hold that on these facts the conduct of the agent was attributable to the company and that the company waived compliance with the condition.

Other issues presented on appeal are: whether the application was void because not signed by the insured or consented to in writing; whether alleged misrepresentations in the application rendered the policy voidable at the company's election; whether, if the company was liable on the policy, the agent was liable to indemnify the company; whether punitive damages were properly assessed against the company; and whether the insured's beneficiary was entitled to attorney's fees for the company's refusal to pay the policy proceeds. The trial court, after a bench trial, held in favor of the agent and the beneficiary on all issues but the last, awarding the beneficiary judgment for the face amount of the policy, plus prejudgment interest and punitive damages, but declining to award attorney's fees. We affirm in part, reverse in part, and remand for further proceedings.

### I.

Eugene W. Peirce, Jr. ("Peirce"), is an insurance agent licensed by the State of New Mexico. Debrot Receconi ("Mrs. Receconi") is the widow of Father Jon Simms Receconi ("Fr. Receconi"), an ordained minister who until his death on October 15, 1987, served as rector of an Episcopal church in Santa Fe. Peirce met the Receconis in the early 1970s and, between 1977 and 1987, sold life insurance to them on behalf of various life insurance companies. In early 1987, Peirce contacted the Receconis and recommended that they replace their life insurance policies with those of another company that could provide lower rates. Pursuant to this recommendation, the Receconis signed applications for life insurance on March 12, 1987, with Allied Insurance Company ("Allied").

Peirce submitted these applications to Allied; Allied in response requested that Fr. Receconi complete an alcohol questionnaire. Subsequently, on August 14, 1987, Peirce contacted the Receconis, told them he was dissatisfied with Allied, and recommended that they instead procure insurance with Jackson National Life Insurance Company ("Jackson").[1] The next day, Peirce went to the Receconis' home and completed a Jackson application for Mrs. Receconi, which she signed, but did not prepare one for Fr. Receconi, who had gone to work. Peirce then met with Fr. Receconi at the latter's office. Peirce discussed Jackson with Fr. Receconi and advised him to obtain life insurance coverage through Jackson. Although Fr. Receconi agreed to do so, Peirce did not have any blank application forms with him, so Fr. Receconi could not fill out or sign an application at that time. However, Fr. Receconi authorized Peirce to do whatever was necessary to procure life insurance coverage from Jackson.

Peirce met with Fr. Receconi on that occasion for approximately thirty minutes. He observed Fr. Receconi to be in excellent health and saw no evidence that he had resumed smoking.[2] Peirce asked Fr. Receconi only one health question at that time: whether he had experienced any major changes in his health since their March 12, 1987, meeting. Fr. Receconi answered that he had not.

Peirce did not fill out Fr. Receconi's application for life insurance with Jackson until September 15, 1987. On that date, Peirce directed his secretary to complete an application, using information from the Allied application and relying on Peirce's own observations of Fr. Receconi's health from the August 15 meeting. The application contained certain health-related questions, all of which were answered negatively, including questions as to whether the applicant had ever been treated for any respiratory or skin disorder and whether the applicant had smoked cigarettes within the past twelve months. The application also inquired about any existing life insurance and whether any application for such insurance had ever been canceled. The application also contained a "Declarations" section, which provided:

> I understand that my statements and answers in this application must continue to be true as of the date I receive the policy. I understand that if my health or any of my answers or statements change prior to delivery of the policy, I must so inform the Company in writing.

Additionally, the application contained the following provisions:

> It is agreed that * * * any policy issued on this application shall not take effect unless all of the following conditions are met: (a) the full first premium is paid, (b) the policy is delivered to the owner during the lifetime of the persons to be covered by such policy; (c) the health of all persons to be covered by the policy remains as represented in this application * * * * [N]o waiver or modification shall be binding upon the Company unless in writing and signed by its President or a Vice President.

After filling out Fr. Receconi's application, Peirce's secretary signed Fr. Receconi's name on it, at Peirce's direction. Peirce then submitted the application to Jackson and simultaneously canceled the Allied application. Before submitting the Jackson application, Peirce did not ask Fr. Receconi any of the questions it contained. In particular, Peirce did not ask Fr. Receconi whether his health had changed since August 15, 1987, did not review the requirements and conditions in the applica-

---

1. Peirce was not a Jackson agent at the time the Receconis submitted their applications for the Allied insurance. He became an agent for Jackson on June 4, 1987, authorized by his agency agreement to solicit applications for insurance but not to make contracts on behalf of Jackson or otherwise bind it by waiving performance of terms or conditions of any policy or other contract to which Jackson was a party.

2. Father Receconi at one time had been a cigarette smoker but had stopped smoking in 1984. When Peirce contacted the Receconis in 1987, he knew that Father Receconi had ceased smoking.

tion, and did not request Fr. Receconi to review the application before submitting it to Jackson.

The application, viewed as of September 15, 1987, contained certain misstatements and omissions. Specifically, it did not disclose Peirce's cancellation of the Allied application nor Fr. Receconi's then existing life insurance with another company. It did not disclose that Fr. Receconi had, according to the testimony of his wife, smoked "a few cigarettes" for two or three days before September 5. It made no mention of the viral pneumonia for which Fr. Receconi was treated beginning on September 6 and continuing on several occasions in early September. Finally, it did not disclose that he had been treated in June and July for skin disorders—a benign keratosis on his back and a slight rash around his mouth, for which he was given tetracycline, which in turn caused him to develop thrush.[3] As Jackson later admitted, these skin disorders were not material and the company would have accepted Fr. Receconi's application had the information been disclosed.

Jackson received the application on September 22, 1987. On October 5, Jackson sent Peirce the life insurance policy with instructions to deliver it to Fr. Receconi upon collection of the premium. Peirce received the policy sometime between October 8 and October 14. The policy stated that its effective date was October 6. On that day, Peirce telephoned Mrs. Receconi and advised her that Jackson had approved Fr. Receconi's application. During that conversation, Mrs. Receconi informed Peirce that Fr. Receconi had been hospitalized for several days with viral pneumonia and that he was in intensive care. Peirce nevertheless requested payment of the premiums on her and Fr. Receconi's policies.

Mrs. Receconi obligingly sent the payments to Peirce on October 8, and Peirce promptly forwarded them to Jackson.

Meanwhile, Fr. Receconi's health worsened, and he remained in the hospital until his death on October 15.[4] Mrs. Receconi provided Peirce with updates on her husband's medical condition every other day from October 6 to October 15, but Peirce never informed Jackson of Fr. Receconi's change in health. Peirce never delivered the life insurance policy to Fr. Receconi.

Mrs. Receconi, as the beneficiary listed on Fr. Receconi's application, filed a claim for policy proceeds, which Jackson received on November 25, 1987. Jackson neither approved nor rejected the claim until March 18, 1988, when it sent Mrs. Receconi a letter denying coverage and returning the premium paid on October 6, 1987. Three days before sending this letter, Jackson brought the present action for declaratory relief against Mrs. Receconi and Peirce. Jackson sought a declaration that it was not liable under the policy on the following grounds: that no insurance contract was formed because of noncompliance with conditions precedent; that any insurance contract was rescinded because Fr. Receconi had materially misrepresented his health on the application; that Peirce had defrauded Jackson by accepting the premium without informing Jackson of Fr. Receconi's change in health; and that Peirce and the Receconis had conspired to defraud Jackson.[5]

Mrs. Receconi filed an answer generally denying Jackson's allegations and asserting a counterclaim for breach of contract. In her counterclaim she sought relief consisting of the face amount of the policy ($250,000), plus prejudgment interest, punitive damages, and attorney's fees. Peirce

---

3. Father Receconi's dermatologist testified that the keratosis was an extremely minor and very common condition. As for Fr. Receconi's thrush, when the tetracycline was discontinued the thrush completely resolved.

4. On October 2, 1987, after several treatments for viral pneumonia, Fr. Receconi had a seizure and was subsequently hospitalized until his death. The cause of death was eventually determined to be AIDS, although the Receconis were not informed of this diagnosis during the period of hospitalization. There is no evidence that Fr. Receconi was aware that he was ill on August 15, 1987, when he authorized Peirce to procure life insurance for him with Jackson.

5. Jackson also sought indemnification from Peirce in the event it was held liable to Mrs. Receconi.

moved to dismiss the claims against him, and the district court granted his motion. This Court, however, in a decision filed on March 15, 1990, reversed that dismissal and remanded the case for further proceedings. We held that the allegations in Jackson's complaint were sufficient to state a claim against Peirce based on several possible theories, including breach of Peirce's agency contract and breach of fiduciary duty.

On remand, Jackson abandoned its claims of fraud and conspiracy to defraud and proceeded against Peirce on grounds of breach of contract and breach of fiduciary duty. Additionally, the district court granted Jackson's motion to amend its complaint to allege that the policy was void because Fr. Receconi did not sign the application or authorize anyone to sign it for him, in purported violation of NMSA 1978, Section 59A–18–8 (Repl.Pamp.1988).

The case proceeded to trial, and the district court entered judgment in favor of Mrs. Receconi, awarding her $250,000 for breach of contract, prejudgment interest, and $50,000 in punitive damages. Her request for attorney's fees was denied. The court also entered a judgment in favor of Peirce, denying Jackson's claims against him for indemnification.

On appeal, Jackson seeks to overturn the judgments in favor of Mrs. Receconi and Peirce, raising the same issues it presented to the trial court. Mrs. Receconi cross-appeals, arguing that the trial court erred in denying her claim for attorney's fees, given the court's finding that Jackson's refusal of her claim was unreasonable. We turn first to what we consider to be Jackson's strongest argument: that the failure of an express condition precedent in the application—that Fr. Receconi's health would remain as represented in the application—excused Jackson from its duty to perform its promise to pay Mrs. Receconi $250,000 in the event of his death.

## II.

Jackson argues that the parties did not form a valid contract of insurance because of the nonoccurrence of three conditions set forth in the application. Two of these conditions related to the applicant's health: The first required Fr. Receconi to inform Jackson in writing of any changes in his health prior to delivery of the policy; [6] the second provided that the policy would not take effect unless Fr. Receconi's health remained as represented in the application. Because Fr. Receconi's health changed dramatically during September and October 1987, and because Fr. Receconi did not inform Jackson of this change, Jackson contends that neither of these conditions was met and that no contract was formed. The third condition was that the policy would not become effective unless it was delivered to Fr. Receconi during his lifetime. Jackson maintains that because Peirce never delivered the policy, this condition also was not met, so again no contract was formed.

■ The third condition is easily dealt with. We agree with the trial court's conclusion that although Peirce never physically delivered the policy, it was constructively delivered and that this constructive delivery satisfied the condition. The trial court held that this occurred when Peirce received the policy from Jackson with instructions to deliver it to Fr. Receconi upon payment of the premium. Mrs. Receconi paid the premium on October 8.

■ There is little question that constructive delivery may satisfy a delivery condition, regardless of language requiring "delivery to the applicant." *See* 1 George J. Couch, *Couch on Insurance 2d* § 10:10, at 696 (rev. vol. 1984). Thus, delivery to the insurer's agent for subsequent delivery to the insured is the equivalent of actual delivery to the applicant, if the contract is consummated in other respects. *Id.* § 10:18, at 705–06. Jackson's delivery of

---

**6.** Jackson is ambivalent in characterizing this requirement; it variously refers to the provision as a "warranty" and as a "condition." As we discuss below, this difference in characterization ultimately does not affect our decision, but it gives rise to the important distinction between a promise and an express condition precedent—a distinction that has special significance in an aleatory contract like a life insurance policy.

the policy to Peirce satisfied the delivery requirement if Peirce complied with all of the conditions prescribed by Jackson. Undoubtedly, collection of the premium from Fr. Receconi was an express condition to delivery of the policy. Peirce complied with this condition because he procured the payment from Mrs. Receconi on October 8, prior to or on the same day he received the policy from Jackson.

■ Thus, as of October 8, Peirce was under an unconditional duty to deliver the policy. It is true, as Peirce and Jackson argue, that Peirce's agency agreement with Jackson provided that he would not make delivery of a policy at any time after he had knowledge that the health of the proposed insured had materially changed since the time the application had been made. But, having notified Mrs. Receconi that Jackson had approved Fr. Receconi's application and having been notified by her that her husband's health had significantly changed for the worse, and having nonetheless requested Mrs. Receconi to pay the initial premium on the policy—which she promptly did—Peirce could not then simply hold the policy and wait to see if Fr. Receconi died or improved to his former state of apparently good health. Having elected on behalf of his principal, Jackson, to request the premium without notifying either Jackson or Mrs. Receconi of the problem, Peirce waived, as we hold below, the condition that Fr. Receconi's health remain as represented in the application. This being so, the same condition could not preclude effective delivery of the policy, and Jackson cannot rely on the provision in Peirce's agency agreement to relieve Peirce of the duty to deliver the policy when, with knowledge of the insured's deteriorated health, he requested payment of the premium.

A much more serious objection, in our view, to enforcement of Jackson's promise to pay the face amount of the policy is the express condition that Fr. Receconi's health remain, at the time of delivery of the poli-

cy, as represented in the application. Jackson frames its argument on this point both in terms of failure of an express condition precedent and in terms of Fr. Receconi's breach of an obligation on his part to inform Jackson in writing if his health changed prior to delivery of the policy. With respect to the latter assertion, Jackson claims that Fr. Receconi's breach of his obligation relieved Jackson of any obligation on its part under the policy.

■ While ultimately we shall treat these two alternative ways of framing Jackson's argument as raising essentially the same issue, there is an important difference between them, which we pause to discuss because doing so highlights the significance of the express condition on which Jackson relies and which we find to have been waived by Jackson's agent. That difference lies in the nature of an insurance contract as an "aleatory" contract, as that term is used in the law of contracts, particularly with reference to insurance contracts. *See generally* 3A Arthur L. Corbin, *Corbin on Contracts* ch. 38 (1960) (especially § 731, "Insurance As An Aleatory Contract").[7] In an aleatory contract, one or both parties' performance is conditional on the happening of a fortuitous event. *Restatement of Contracts* § 291 (1932). Unlike most bilateral contracts, the promise of each party to an aleatory contract is not given in exchange for the prospect of performance of the other party's promise, and actual or prospective nonperformance by one party to the contract does not discharge the other. *See id.* §§ 292, 293; *Restatement (Second) of Contracts* § 379 (1981); 3A Corbin, *supra,* § 728 ("Aleatory Contracts Are Not Agreements to Exchange Equivalent Performances"). Although the contract in this case was essentially unilateral—consisting as it did of Jackson's promise to pay $250,000 conditioned on Fr. Receconi's death, given in exchange for Fr. Receconi's payment of the

7. *Black's Law Dictionary* defines an aleatory contract as: "A mutual agreement, of which the effects, with respect to both the advantages and losses, whether to all the parties or to some of them, depend on an uncertain event * * * * A contract, the obligation and performance of which depend upon an uncertain event, such as insurance, engagements to pay annuities, and the like." *Black's Law Dictionary* 70 (6th ed. 1990).

premium—to the extent the application contained promises by Fr. Receconi it can properly be characterized as bilateral.[8] Therefore, under the *Restatement* rule, Fr. Receconi's nonperformance of his promise to notify Jackson of a change in his health prior to delivery of the policy would not discharge Jackson from performance of its aleatory promise to pay Fr. Receconi's beneficiary the face amount of the policy in the event of his death.

Professor Corbin, however, qualifies the *Restatement* rule on nondischarge of one party's obligation (in an aleatory contract) because of the other party's breach of his obligation, as follows: "A promise in an aleatory contract is constructively conditional on absence of action by the promisee that substantially increases the risk that the promisor has assumed." 3A Corbin, *supra*, § 730, at 415–16. In the present case, it can be said that Fr. Receconi's failure to notify Jackson in writing of his change in health substantially increased the risk that Jackson had assumed. Thus, under Corbin's formulation, Jackson's promise was constructively conditioned on Fr. Receconi's performance of his promise to notify Jackson of his change in health.

As so viewed, the condition that Fr. Receconi notify Jackson of his changed health is substantially the same as the second of the two health conditions mentioned above—the condition (which *was* an express condition precedent in the application) that Fr. Receconi's health at the inception of the insurance agreement remain as represented in the application. The question then, and upon which decision of this case turns, is whether this condition (or these

two conditions if they are viewed separately) was (were) waived by Peirce's action in obtaining payment of the premium with knowledge that Fr. Receconi's health had significantly deteriorated. As to both of these conditions, the following statement by Corbin looms as a significant obstacle to a holding that Jackson became obligated to pay the face amount of the policy on Fr. Receconi's death: "A voluntary waiver of a condition in an aleatory contract like insurance will not be effective if the extent of the risk assumed is thereby materially increased." *Id.* § 753, at 488.

There is no question that Fr. Receconi's changed health between August 15, 1987, and the date we have held the policy was constructively delivered, October 8, 1987, materially increased Jackson's risk that it would have to perform its promise—sooner rather than later. As Jackson argues, the applicant's health status is critical to a life insurer's ability to gauge and evaluate the risk it is being asked to insure. An insurer has the right to intelligently pass upon the risk insured. *Rael v. American Estate Life Ins. Co.*, 79 N.M. 379, 382, 444 P.2d 290, 293 (1968). The question here is whether it is fair to hold Jackson, as the trial court did, to a waiver of the health condition in the application, given that noncompliance with the condition undeniably increased the risk that Jackson had assumed.

It appears that no New Mexico court has considered whether an insurance company can waive a condition in an application or policy relating to the continued

8. As phrased in the "Declarations" section of the application, Fr. Receconi's obligation to notify Jackson if his health changed prior to delivery of the policy was a promise, not an express condition.

Mrs. Receconi argues, and the trial court found, that this obligation, as well as the condition that Fr. Receconi's health remain as represented in the application, was not binding because Peirce had failed to make Fr. Receconi aware of these requirements in the application. We agree with Jackson's response to this argument: Mrs. Receconi cannot claim entitlement to benefits under the policy and at the same time claim that Fr. Receconi was not bound by

the obligations and conditions set out in the application that gave rise to the policy itself. *See* 1 John & Jean Appleman, *Insurance Law & Practice* § 173, at 535 (rev. vol. 1981) (insured becomes chargeable with policy terms by paying premium or bringing suit on policy). While, as stated below, we are unwilling to charge Fr. Receconi with any misstatements or omissions of fact that he did not make to Peirce and that resulted from the manner and timing of Peirce's completion and submission of the application, we think that Fr. Receconi obligated himself to Jackson's standard-form application requirements when he authorized Peirce to obtain insurance from Jackson.

good health of the applicant.[9] Numerous other jurisdictions, however, have considered this issue, and the majority rule appears to be that an insurance company can waive such a condition. *See* 1 Couch, *supra*, §§ 11:22, 11:23; 7 *id.* §§ 37:123, 37:130 (rev. vol. 1985). *See also, e.g., Southern States Life Ins. Co. v. Dunckley*, 148 So. 320, 322 (Ala.1933) (life insurer may waive provision that policy will not take effect until payment of first premium while insured is in good health); *Pomerenke v. National Life & Accident Ins. Co.*, 241 N.E.2d 390, 393 (Ind.Ct.App.1968) (provision that life policy will not take effect unless insured is in good health on date of issue is made for benefit of insurer and may be waived by it); *American Nat'l Ins. Co. v. Bailey*, 3 S.W.2d 539, 543 (Tex.Civ. App.1927) (when insurance agent knew facts concerning insured's bad health yet nevertheless collected insurance premiums and delivered policy to applicant, company waived good health condition of policy).

Those courts that have recognized waiver by an insurance company of a good-health condition have relied on general principles of good faith and fair dealing. They have recognized, as has this Court, that an insurance contract requires good faith on the part of both parties to the contract. *See Modisette v. Foundation Reserve Ins. Co.*, 77 N.M. 661, 666, 427 P.2d 21, 25 (1967) ("The obligation to deal fairly and honestly rests equally upon the insurer and the insured."). Consistently with this principle, they have identified the basic unfairness that would result from allowing an insurer to accept payment on a policy and later deny liability based on information it had when it received the payment. *See Southern States*, 148 So. at 322 (quoting *Phoenix Life Ins. Co. v. Raddin*, 120 U.S. 183, 196, 7 S.Ct. 500, 506, 30 L.Ed. 644 (1887)); *Pomerenke*, 241 N.E.2d at 393; *American Nat'l Ins. Co. v. Wiggins*, 4 S.W.2d 595, 596 (Tex.Civ.App.1928). We agree with the reasoning of these cases

and hold that an insurance company can waive a condition precedent relating to the continued good health of an applicant.

■ Recognizing that waiver is available, however, does not automatically lead to a finding of waiver on the present facts. As this Court has stated on many occasions, waiver is the intentional relinquishment or abandonment of a known right. *E.g., J.R. Hale Contracting Co. v. United New Mexico Bank*, 110 N.M. 712, 716, 799 P.2d 581, 585 (1990). Thus, in the present case, waiver requires a showing both that Jackson had knowledge of the nonoccurrence of the condition and that Jackson intended to waive compliance with the condition.

■ As Jackson vigorously argues, the company itself did not know of Fr. Receconi's deteriorating health before it accepted the premium payment from its agent. However, as a general rule, knowledge of an insurer's agent may be imputed to the insurer for the purpose of waiver. *Lumbermens Mut. Ins. Co. v. Bowman*, 313 F.2d 381, 388 (10th Cir.1963); 16C Appleman, *supra* note 8, § 9101. Thus, notice to an agent, or knowledge imparted to him, is notice to the company, regardless of whether or not the agent actually communicates the information to the company. *Id.* § 9101, at 9. Here, although Jackson itself had no knowledge of Fr. Receconi's change in health before it accepted the premium, Peirce did. When Peirce telephoned Mrs. Receconi on October 6 to inform her that Jackson had approved the life insurance applications, Mrs. Receconi informed him that her husband was in the hospital, possibly suffering from viral pneumonia. After receiving this information, Peirce nonetheless requested and received premium checks from Mrs. Receconi and submitted these checks to Jackson. Peirce did not inform Jackson of Fr. Receconi's declining health at that time, but his knowledge is nevertheless imputed to Jack-

9. While, as Jackson argues, the doctrine of waiver cannot be invoked to form a contract of insurance, *Western Casualty & Sur. Co. v. City of Santa Fe*, 84 N.M. 409, 411, 504 P.2d 17, 19 (1972), that general rule applies only to the nature of the coverage afforded, not to limitations or conditions pertinent to the risk already covered by the policy. 16B Appleman, *supra* note 8, § 9090, at 588–89.

son. This knowledge, combined with Jackson's subsequent acceptance of the premium and retention of it for four months, constituted a waiver of the condition or conditions relating to Fr. Rececconi's health.

■ We reach this decision notwithstanding the provision in the application, previously quoted, that an agent such as Peirce may not waive such a condition. As this Court has previously stated, "A nonwaiver agreement itself may be waived by conduct, the same as stipulations in the policies." *Green v. General Accident Ins. Co. of America,* 106 N.M. 523, 526, 746 P.2d 152, 155 (1987) (quoting *Miller v. Phoenix Assurance Co.,* 52 N.M. 68, 73, 191 P.2d 993, 996 (1948)).[10] Such a waiver occurs through the acts of the insurer or its general officers, by express agreement or impliedly from conduct, or by acts of the insurer inconsistent with an intent to enforce the condition. 16C Appleman, *supra* note 8, § 9236, at 291–92. And,

> Since a policy limitation of this character cannot override or supersede the law making the principal liable for the negligent or fraudulent act of its agent, and the law of equitable estoppel, this limitation may itself be waived by the insurer through its agent. This type of provision is not effectual to prevent the acts of an authorized agent of the insurance company in the conduct of its business from constituting a waiver of its conditions. Such limitation may be waived by an agent acting within his actual *or apparent* authority.

*Id.* at 292–93 (emphasis added; footnotes omitted). *See also* 3 Couch, *supra,*

§ 26:91, at 680 ("By the most liberal and probably the majority view, the insured is permitted to rely on the apparent authority of the insurer's agent, regardless of the presence in the policy of a limiting provision." (footnote omitted)).

Similarly, although there is considerable authority to the contrary, *see* 16C Appleman, *supra* note 8, § 9231,

> the general trend of modern cases is to the effect that any knowledge of an agent, while acting within the scope of the powers entrusted to him, will, in the absence of fraud or collusion between the insured and the agent, be imputed to the insurer, though the policy contains stipulations to the contrary.

*Id.* § 9233, at 276–77.

It has been held that a clause in a policy prohibiting a waiver except by an endorsement of an officer of the insurer is void or ineffective. *Id.* § 9232, at 273. This result sometimes is attributed to a statute permitting service of notice on agents of insurance companies or to a statute placing an agent in the position of the insurer. *Id.* at 272. New Mexico has a statute of the latter sort, which provides in pertinent part:

> Any licensed agent appointed as agent by an insurer shall, in any controversy between the insured or his beneficiary and the insurer, be held to be the agent of the insurer which issued the insurance solicited or applied for, *anything in the application or policy to the contrary notwithstanding * * *.*

NMSA 1978, § 59A–18–24 (Repl.Pamp.1988) (emphasis added).[11]

---

**10.** Jackson argues that the nonwaiver provision was effective to prevent any waiver by Peirce. It relies on *Union Life Ins. Co. v. Burk,* 169 F.2d 235, 238–39 (10th Cir.1948), for the proposition that "By the laws of New Mexico, a provision in an insurance policy providing that no person except designated individuals shall have power to waive contractual provisions is binding and renders ineffective any action on the part of others purporting to waive or to modify such policy provisions." In support of this statement, the Tenth Circuit Court of Appeals cited the following New Mexico cases: *Smith v. New York Life Ins. Co.,* 26 N.M. 408, 193 P. 67 (1920); *Bloodgood v. Woman's Benefit Assoc.,* 36 N.M. 228, 13 P.2d 412 (1932); *Warren v. New York*

*Life Ins. Co.,* 40 N.M. 253, 58 P.2d 1175 (1936). We have reviewed these cases and, without engaging in a lengthy analysis of the opinions and with all due respect to the Tenth Circuit, we do not believe they support the blanket rule of law advanced in *Burk.*

**11.** It will be noted that this statute refers to "any licensed agent" and does not distinguish between "general" agents, "special" agents, "soliciting" agents, "local" agents, and other agents with similar qualifying descriptions. Such distinctions are often made in cases or treatises discussing the subjects considered in the text, *see, e.g.,* 16C Appleman, *supra* note 8, § 9237; 3 Couch, *supra,* §§ 26:99–101, 147–55; but we

■ We consider this statute all but dispositive of the argument that Peirce had no authority to waive the health condition in Fr. Receconi's application. He was Jackson's agent, and he solicited the insurance for which Fr. Receconi applied. In the ensuing controversy between Jackson and Mrs. Receconi, the question may be framed as follows: To whom should be allocated the risk that the agent would violate the instructions in his agency agreement that he refrain from delivering the policy after he had knowledge that the health of the proposed insured had materially changed? As we have held, he constructively delivered the policy when he requested the premium with this knowledge and failed to inform Jackson that the insured's health had changed. Reverting to the principle of good faith and fair dealing discussed above, we think it fair in this situation to allocate to the insurer the risk of the agent's violation of his duty to his principal. The insurer selected (or at least contracted with) him, received the benefit of his insurance solicitations, and presumably had the opportunity to train him in dealing with insureds. Neither the insured nor his beneficiary knew that he was violating his duty, and both presumably assumed that he would alert them to a problem if one existed. From the standpoint of Fr. and Mrs. Receconi, agent Peirce *was* Jackson National Life Insurance Company; they had no dealings with the president or a vice-president at the company's headquarters in Lansing, Michigan, and were perfectly entitled to rely on the agent with whom they dealt to disclose, before requesting payment of the premium, any information he had that the insurance would not become effective.

This conclusion may be somewhat inconsistent with Corbin's assertion that a voluntary waiver of a condition in an aleatory contract like insurance will not be effective

if the extent of the risk is thereby materially increased. It is possible to view Mrs. Receconi's payment of the premium as consideration for Jackson's waiver, through Peirce, of the health condition or—perhaps more soundly—as detrimental reliance leading to an estoppel. *See Hale Contracting,* 110 N.M. at 716, 799 P.2d at 585 (discussing waiver for consideration and waiver by estoppel). However, it seems more straightforward to recognize Peirce's waiver for what it was: a voluntary waiver, on behalf of his principal Jackson, made with knowledge of the facts and with the understanding, which he either had or should have had, that his action would result in Jackson's inability to assert Fr. Receconi's deteriorated health as a defense to a policy claim. This result may not square precisely with Corbin's statement of the consequences of a voluntary waiver of condition in an aleatory contract, but in our opinion it does comport with the principle of good faith and fairness surrounding all insurance contracts.

### III.

Jackson's most strenuously asserted argument on this appeal—although we do not attach nearly as much credence to it as does Jackson—is that Fr. Receconi's life insurance policy was void *ab initio* because he did not sign the application or consent to the policy in writing. This resulted, according to Jackson, in a violation of NMSA 1978, Section 59A–18–8 (Repl.Pamp.1988), which provides in relevant part:

> No life or health insurance contract upon an individual, except a contract of group life insurance or of group or blanket health insurance, shall be made or effectuated unless at the time of the making of the contract, such individual

deem such distinctions irrelevant under our statute in any controversy between the insured (or his beneficiary) and the insurer. *See also Pribble v. Aetna Life Ins. Co.,* 84 N.M. 211, 214, 501 P.2d 255, 258 (1972) ("We are unwilling to adopt a rule by which disposition of cases such as this is made on the basis of an individual's title."). Of course, if the insured has knowledge

of any limitations on the agent's authority, he may well be bound by such limitations. *See, e.g.,* 3 Couch, *supra,* § 26:80, at 657. It is undisputed in this case that neither Fr. Receconi nor Mrs. Receconi knew of the limitations on Peirce's authority as contained in either Fr. Receconi's application or Peirce's agency agreement.

applies therefor or has consented thereto in writing * * *.[12]

Since a contract made in violation of statutory requirements is (under some circumstances) void, *see Farrar v. Hood,* 56 N.M. 724, 729, 249 P.2d 759, 762 (1952) (general rule that contracts in violation of statute prescribing penalties are void), and since the evidence is undisputed that Fr. Receconi neither applied for nor consented to the policy in writing, Jackson argues that the policy was void (not only void, but void *"ab initio"*).

At common law, an insurance contract taken out on the life of the insured by someone other than the insured without the insured's knowledge or consent was considered adverse to the insured's interest and unenforceable. 44 C.J.S. *Insurance* § 241, at 1001–02 (1945); 1 Bertram Harnett & Irving I. Lesnick, *The Law of Life & Health Insurance* § 3.04[1][a] (1991). The reason for the rule was that an insurance contract on another without his knowledge, even when there might otherwise be an insurable interest, created the opportunity of foul play by encouraging speculation in another's life. *Id.*

Legislation similar to Section 59A–18–8 has been enacted in twenty-eight states, codifying this common law rule. *Id.* § 3.04[2][a]. Courts construing these statutes have agreed that they codify, in some form, the common law rule requiring the consent of the insured in order to guard against foul play. *See, e.g., Wren v. New York Life Ins. Co.,* 493 F.2d 839, 841 (5th Cir.1974) (applying Georgia law); *Holmes v. Nationwide Mut. Ins. Co.,* 40 Misc.2d 894, 244 N.Y.S.2d 148, 150–51 (Sup.Ct.), *aff'd,* 19 A.D.2d 947, 245 N.Y.S.2d 330 (App.Div.1963). We therefore agree with Mrs. Receconi that the statute is intended for the protection of the insured.

Jackson invokes *Wren* (along with certain Georgia cases, *Wood v. New York Life Ins. Co.,* 255 Ga. 300, 336 S.E.2d 806 (Ga. 1985), and *Time Ins. Co. v. Lamar,* 195 Ga.App. 452, 393 S.E.2d 734 (1990)) and a federal case interpreting Utah law, *Alleman v. Lincoln Nat'l Life Ins. Co.,* 636 F.2d 1195 (10th Cir.1981), for the proposition that Jackson's policy on Fr. Receconi was void *ab initio*. Mrs. Receconi responds with cases from New York and Louisiana holding that an insurance contract in violation of a consent statute similar to Section 59A–18–8 is nevertheless enforceable against the insurer. *Holmes, supra; New England Mut. Life Ins. Co. v. Caruso,* 73 N.Y.2d 74, 538 N.Y.S.2d 217, 535 N.E.2d 270 (N.Y.1989); *Adam Miguez Funeral Home, Inc. v. First Nat'l Life Ins. Co.,* 234 So.2d 496 (La.Ct.App.1970).

■ Without dissecting the various cases cited by the parties, we think this issue is satisfactorily resolved by reference to New Mexico authority, which we deem sufficiently analogous and persuasive to be controlling in this context. These cases hold, basically, that an insurance policy which violates a statute designed for the protection of the insured is nevertheless enforceable against the insurer. *See Foundation Reserve Ins. Co. v. Kennedy,* 79 N.M. 382, 383–84, 444 P.2d 293, 294–95 (1968); *Buck v. Mountain States Inv. Corp.,* 76 N.M. 261, 266, 414 P.2d 491, 494

---

**12.** There are three exceptions to the signature requirement, one of which applies when a spouse effectuates insurance upon the other spouse. Subsection 59A–18–8(A). Mrs. Receconi argues that this exception applies in the present case because she "effectuated" life insurance on Fr. Receconi when she signed the check in payment of the first premium and sent the check to Peirce. We find it unnecessary to address this issue because we hold that the claimed noncompliance with Section 59A–18–8 did not render the policy void *ab initio* or otherwise impair its effectiveness.

Mrs. Receconi also argues that the statute was not violated because Fr. Receconi *did* apply for the policy, albeit not in writing and not by signing the application. She maintains that the statute is intended to apply only when someone other than the insured obtains insurance on the insured's life and that, since Fr. Receconi was both the insured and the applicant, the statute has no application. We certainly do not reject this argument (which we find rather ingenious) out of hand, since its basic premise—that the purpose of the statute is to protect the insured from actions by others who might be tempted to gamble on his life—is consistent with the purpose we describe in the text. However, again we need not expressly pass on the validity of the argument, because we hold that the statute, even if "violated," did not invalidate Jackson's policy on Fr. Receconi.

(1966); *Douglass v. Mutual Benefit Health & Accident Ass'n,* 42 N.M. 190, 202–11, 76 P.2d 453, 460–66 (1937); *see also Forrest Currell Lumber Co. v. Thomas,* 81 N.M. 161, 165, 464 P.2d 891, 895 (1970) (insurance company could not have avoided liability on policy based in part on illegal consideration even though such illegality violated state criminal law); *Southern States Life Ins. Co. v. McCauley,* 81 N.M. 114, 116, 464 P.2d 404, 406 (1970) (same).

We first adopted this rule in *Douglass,* in which we held that a policy made in violation of various statutes regulating insurance policies was nevertheless an enforceable contract. 42 N.M. at 204–11, 76 P.2d at 461–66. In so holding, we recognized the general rule that an act done in violation of a statutory prohibition is void. Nonetheless, we relied on an exception to the general rule: Violation of a statute will not render a contract void if the legislature does not intend that result. In *Douglass,* the legislature had not expressly declared that contracts made in violation of the statutes were void. Moreover, a holding that such contracts were unenforceable by the insured would thwart the purpose of the statutes, which were enacted to protect the insured. We said, in language equally applicable to the present case: "If contracts made in violation of this statute release the insurer, then its object and purpose is circumvented, and the door to injustice and oppression is wide open." *Id.* at 206, 76 P.2d at 463.

■ In the present case, Section 59A–18–8 does not expressly state that contracts made in violation of it are void. Moreover, the statute furthers an important public policy against wagering or gambling on human lives and thereby protects persons who are, or are about to become, insured.[13] Where, as here, the insured consents to, and even directs, procurement of an insurance policy on his life and believes that he is thereby insured, permitting the insurance company to avoid liability when the insured dies would not further the purpose of Section 59A–18–8 and would, in the language of *Douglass,* open the door wide to injustice and oppression.

Finally, we agree with Mrs. Receconi's assertion that our conclusion is buttressed by NMSA 1978, Subsection 59A–18–21(A) (Repl.Pamp.1988). Assuming for present purposes that Fr. Receconi's application violated Section 59A–18–8, we think that Jackson's policy was nevertheless valid under that subsection. It provides:

A policy delivered or issued for delivery after the effective date of the Insurance Code to any person in this state in violation of the Insurance Code [which includes Section 59A–18–8] but otherwise binding on the insurer, shall be held valid, but shall be construed as provided in the Insurance Code.

We hold that Jackson's policy was not void or otherwise unenforceable because Fr. Receconi did not sign the application or consent to the policy in writing.

## IV.

■ Jackson devotes about a page in its brief in chief to its argument that the application contained material misrepresentations justifying rescission of the policy. The argument merits the short shrift Jackson gives it. The "misrepresentations" relied on are the omissions of Fr. Receconi's medical history during the period June–September 1987, the existence of another life insurance policy, the cancellation of the Allied application, and Fr. Receconi's resumption of cigarette smoking for a few days during early September 1987.

The short answer to Jackson's short argument is that Fr. Receconi made none of these misrepresentations; to the extent any were made, Peirce made them. When Peirce asked Fr. Receconi on August 15, 1987, whether he had undergone any major changes in his health since submission of the Allied application in March of that year, Peirce knew about the existing life insur-

---

**13.** We do not disagree with Jackson's assertion that the statute may have other purposes, such as providing the insured the opportunity to review the application for inaccuracies prior to submission. However, the existence of other legislative purposes does not negate or lessen the importance of the statute's purpose of protecting the prospective insured.

ance policy and knew that Fr. Receconi was a nonsmoker. When Peirce submitted the application, completed and signed by his secretary at his direction, he knew of the cancellation of the Allied application; it was he who canceled it. Peirce's delay for a month in submitting the application to Jackson cannot be attributed to Fr. Receconi. Fr. Receconi's answer to Peirce's only question in August—whether there had been any major changes in his health—was truthful; the dermatology treatments in June and July were for minor skin ailments and, as Jackson conceded at the trial, did not affect either its acceptance of the risk or the hazard it assumed. Fr. Receconi's treatment for viral pneumonia on several occasions in early September could not have been known when he answered Peirce's question on August 15; and it was Peirce's delay in submitting the application, not any untruthfulness by Fr. Receconi, that resulted in Jackson's failure to be informed of this part of Fr. Receconi's medical history at the time it received the application.

 As noted in footnote 8, we think it is fair to charge Fr. Receconi with the promises and conditions contained in the application, because in requesting Peirce to procure insurance from Jackson, Fr. Receconi in effect authorized Peirce to assume on his behalf the standard provisions in Jackson's application. But we are unwilling to extend this principle to a holding that Fr. Receconi authorized Peirce to make misrepresentations on his behalf. By entering into an agency relationship with a soliciting agent such as Peirce, an insurer assumes the risk that the agent will incorrectly complete an application for insurance. If the agent does not submit the application to the prospective insured for review and signature, so that the insured can be charged with knowledge of the contents of the application, the insurer cannot

escape liability under the ensuing insurance policy on the ground that the insured "misrepresented" facts that the agent has inserted in, or omitted from, the application. *See* 17 Appleman, *supra* note 8, § 9401, at 2–3 (agent's insertion of false answers in application, particularly when insured is not at fault, is considered act of insurer and will preclude it from defending upon such ground); *see also Douglass,* 42 N.M. at 198, 76 P.2d at 458 (agent's breach of duty to prepare application accurately and truthfully to state result of negotiations is in legal effect fault of company).

We affirm the trial court's conclusion that Fr. Receconi made no material misrepresentations in the application that would allow Jackson to rescind the policy.

## V.

As its next claim of error, Jackson asserts that the trial court improperly refused to award it indemnification against its agent, Peirce. We agree that there is no justification for the judgment in favor of Peirce and against Jackson on the latter's claim for indemnification.

Following this Court's previous reinstatement of Jackson's complaint against Peirce, the trial court on remand determined that Peirce was not liable to Jackson under either theory asserted at the trial: breach of Peirce's agency contract or breach of fiduciary duty.[14] It found that Peirce did not breach the express provisions of his agency contract and that "[a]lthough he acted loosely and carelessly and was disorganized, [Peirce] did not breach the fiduciary duties owed the company by him."

 We find no substantial evidence to support the trial court's finding that Peirce did not breach his duty to Jackson. On the contrary, the undisputed evidence shows that Peirce, in failing to inform Jackson of

14. In our previous decision, we held that breach of fiduciary duty was one of the theories sufficiently pled in Jackson's complaint to support a claim against Peirce for indemnification. This was one of the two theories pursued by Jackson at the trial. Neither party on appeal resists labeling Peirce's duty as a "fiduciary" one, and so there is no occasion for us to comment on the nature—as "fiduciary" or not—of Peirce's duty. For purposes of this case, we simply hold that the agent had a duty to his principal and breached that duty, and leave for another case the question whether the duty is properly characterized as a fiduciary one.

418

Fr. Receconi's deteriorating health, breached his duty to the company.

As an agent, Peirce owed certain duties to Jackson, one of which was to disclose any fact that might affect his principal's interests. *See Gelfand v. Horizon Corp.*, 675 F.2d 1108 (10th Cir.1982) (real estate agent breached his fiduciary duty to corporation when he failed to disclose that purchaser of property was a corporation in which his wife held a one-third interest). The *Restatement* specifically describes this duty:

> Unless otherwise agreed, an agent is subject to a duty to use reasonable efforts to give his principal information which is relevant to affairs entrusted to him and which, as the agent has notice, the principal would desire to have and which can be communicated without violating a superior duty to a third person.

*Restatement (Second) of Agency* § 381 (1958). The duty exists if the agent acquires knowledge of facts which, in view of his relation with the principal, he should know may affect the desires of the principal. *Id.* comment a. In the present case, Peirce knew, before he collected the premium, that Fr. Receconi had been hospitalized with viral pneumonia. Although Peirce did not know that Fr. Receconi had AIDS, the latter's hospitalization because of pneumonia was sufficiently serious that he should have communicated this information to Jackson. He should have known that Jackson would want to be notified of this development because it materially affected the risk assumed by the company. In not disclosing Fr. Receconi's change in health to Jackson, Peirce failed to protect the company's interests and breached his duty as agent.

Peirce's breach of this duty subjects him to liability in tort for the loss which results therefrom. *See id.* § 401 comments a, d. This includes the payment of damages by the principal to a third person, which in the present case equals $250,000 (the amount of the policy proceeds), plus prejudgment and postjudgment interest as awarded by the trial court. Additionally, as a general rule, an indemnitee

is entitled to recover its reasonable attorney's fees incurred in defense of the claim indemnified (but not those incurred in establishing the right of indemnity) as part of its damages. *E.g., United General Ins. Co. v. Crane Carrier Co.*, 695 P.2d 1334, 1339 (Okla.1984).

The same result follows from the indemnity clause in Peirce's agency agreement with Jackson. That clause provides that the agent shall indemnify the company for any expenses, costs, causes of action, and damages resulting from or growing out of any unauthorized act or transaction by him or his employees. The unauthorized acts in this case were Peirce's collection of the premium from Mrs. Receconi with knowledge that Fr. Receconi's health had significantly changed for the worse and Peirce's submission of the application, completed by him and signed by his secretary, without verifying the accuracy of the information contained in (or omitted from) it.

Thus, Jackson is entitled to recover from Peirce its reasonable costs in bringing this declaratory judgment action (at both the trial and appellate levels), in addition to the amounts assessed against it and affirmed on this appeal, but excluding the costs it incurred in seeking indemnification from Peirce. We also exclude from the amount for which Jackson is entitled to be indemnified all amounts attributable to its resistance to Mrs. Receconi's claim on grounds other than failure of the conditions precedent in the application. In determining these various amounts on remand, the trial court will have a difficult job of allocation; but the parties will offer such evidence as they can adduce on this question, and the trial court must estimate as best it can the expenses for which Peirce must indemnify Jackson and those we have held are not subject to indemnification.

## VI.

As its final point of error, Jackson asserts that the trial court erred in awarding punitive damages to Mrs. Receconi. The trial court determined that Jackson's refus-

al to pay was without just cause or excuse and was unreasonable, and that the company thereby acted "willfully, recklessly and in bad faith, demonstrating disregard and indifference to the rights of its insured and his beneficiary." Jackson attacks these findings as unsupported by substantial evidence and also argues that the award of punitive damages is inconsistent with the court's refusal to award attorney's fees under NMSA 1978, Section 39–2–1 (Repl.Pamp.1991) (authorizing attorney's fees in favor of insured upon finding that insurer acted unreasonably in failing to pay the claim).

■■■■ An award of punitive damages is discretionary and will be upheld if substantial evidence supports the award. *Economy Rentals, Inc. v. Garcia*, 112 N.M. 748, ——, 819 P.2d 1306, 1322 (1991). The trial court's factual findings, however, must satisfy the legal standard or standards for a punitive damage award. *Id.* As this Court stated in *United Nuclear Corp. v. Allendale Mutual Insurance Co.*, 103 N.M. 480, 485, 709 P.2d 649, 654 (1985), the assessment of punitive damages for breach of an insurance policy requires evidence of bad faith or malice in the insurer's refusal to pay a claim. "Bad faith" has been defined as "any frivolous or *unfounded* refusal to pay." *Id.* (quoting *State Farm General Ins. Co. v. Clifton*, 86 N.M. 757, 759, 527 P.2d 798, 800 (1974) (emphasis added in *United Nuclear*)). *See also Gallegos v. Citizens Ins. Agency*, 108 N.M. 722, 730, 779 P.2d 99, 107 (1989) (stating same standard); *Chavez v. Chenoweth*, 89 N.M. 423, 429, 553 P.2d 703, 709 (Ct.App. 1976) (same).

■■■■ "Unfounded" in this context does not mean "erroneous" or "incorrect"; it means essentially the same thing as "reckless disregard," in which the insurer "*utterly* fail[s] to exercise care for the interests of the insured in denying or delaying payment on an insurance policy." *Jessen v. National Excess Ins. Co.*, 108 N.M. 625, 628, 776 P.2d 1244, 1247 (1989) (emphasis

added). It means an utter or total lack of foundation for an assertion of nonliability—an arbitrary or baseless refusal to pay, lacking any arguable support in the wording of the insurance policy or the circumstances surrounding the claim. It is synonymous with the word with which it is coupled: "frivolous."

■■■■ Although the trial court, in support of its award of punitive damages, made numerous findings relating to other aspects of Jackson's claim of nonliability, and although these findings are supported by substantial evidence, none of the findings determined that Jackson's refusal to pay based on failure of the conditions precedent in the application was frivolous or unfounded, as we have defined that term. The trial court did find, as we have seen, that Jackson, through Peirce, waived the conditions precedent; but this finding, while sufficient to support a judgment for the policy proceeds, was not sufficient to support the judgment for punitive damages.

■■■■ The findings that the court *did* make included a finding that Jackson violated the terms of its own policy (and, we would add, an applicable statute, NMSA 1978, Section 59A–20–14 (Repl.Pamp.1988)), requiring acceptance or rejection of the claim within two months after Jackson's receipt of proof of death. The company received the death claim on November 25, 1987, but did not reject it until March 18, 1988, almost four months later. The court also found that Jackson's eventual denial of the claim "was without cause or excuse and [was] unreasonable" and "demonstrated a total disregard and indifference to the rights of its insured and his beneficiary." In reaching this conclusion, the court apparently reasoned that by the time Jackson denied the claim it had sufficient knowledge of the facts to make its denial unreasonable. The court determined that as of March 18, 1988, the company knew all the relevant facts, except for the fact that Fr. Receconi himself had not signed the application.[15]

15. The trial court found that Peirce made inaccurate and misleading statements to Jackson on

December 2, 1987, and February 1, 1988, regarding the completion and signing of the appli-

Again, however, the trial court made no finding that Jackson's refusal to pay based on noncompliance with the conditions precedent in the application was frivolous or unfounded, and even if it had made such a finding there was no substantial evidence that would have supported it. The plain fact is that Jackson was presented with a claim for insurance on a policy that Jackson believed had never been delivered to the insured and the application for which, apparently signed by the insured, omitted various facts called for in the application. These problems were sufficient to justify the insurer's investigation (which Mrs. Receconi concedes), and during the course of that investigation Jackson learned that Fr. Receconi's health had not remained as represented in the application. We hold as a matter of law, on these facts, that Jackson's refusal to pay the claim was neither frivolous nor unfounded.

## VII.

In her cross-appeal, Mrs. Receconi agrees with Jackson that the trial court's award of punitive damages and refusal to award attorney's fees are inconsistent, but asserts that the remedy is not to vacate the punitive damage award but rather to reverse the court's denial of her request for attorney's fees. That request, again, is based on Section 39-2-1, which provides that in any action in which an insured prevails against an insurer who has not paid a claim for first-party coverage, the insured "may be awarded reasonable attorney's fees and costs of the action upon a finding by the court that the insurer acted unreasonably in failing to pay the claim." As we have seen, the trial court made several findings about the unreasonableness of Jackson's failure to pay the claim, and Mrs. Receconi argues that the court's refusal to award attorney's fees cannot stand in light of these findings.

We have already expressed our view that these findings of unreasonableness on Jackson's part—of its "total disregard and indifference to" the Receconis' rights, its lack of "just cause or excuse" in refusing to pay Mrs. Receconi's claim, and its "willful, reckless, and bad faith" action in denying that claim—insofar as the findings were made to support the award of punitive damages, lacked substantial evidentiary support because they did not address what we regard as Jackson's reasonable—albeit erroneous—position that conditions precedent in the application were not satisfied. But there is a significant difference between an insurer's conduct that will support a punitive damage award—a frivolous or unfounded refusal to pay—and the conduct that will justify an attorney's fee award under Section 39-2-1—an "unreasonable" denial of a claim, looking at the insurer's conduct from an objective standpoint and measuring it against a "reasonably prudent insurer" standard. *Cf. Rivera v. Brazos Lodge Corp.*, 111 N.M. 670, 675, 808 P.2d 955, 960 (1991) (SCRA 1986, 1-011 (Rule 11), unlike its federal counterpart, imposes sanctions based on a subjective, rather than an objective, standard).

Given this difference, we would be inclined to hold that the trial court's refusal to award attorney's fees could not stand in the face of its findings of unreasonable conduct on Jackson's part, if that conduct had been based only upon the facts to which the trial court devoted so much attention in its findings. Those findings were that by March 15, 1988, Jackson knew that the only undisclosed medical information in the application related to the minor and immaterial dermatological treatments Fr. Receconi had received in June and July 1987; that Peirce had interviewed Fr. Receconi on August 15, 1987, but delayed submitting the application until September 15; and that on August 15 Fr. Receconi was in apparent good health and had not smoked for several years. However, Jackson's conduct—its refusal to pay—was also

cation. Apparently, Jackson did not learn that Fr. Receconi had not signed the application himself until Peirce's deposition on March 23, 1989. Peirce had obtained a stay of discovery pending the disposition of his motion to dis-

miss, which the district court did not lift until March 15, 1989. Thus, Jackson did not learn that Fr. Receconi had not signed the application until rather late in the lawsuit.

based on the undeniable nonoccurrence of conditions precedent in the application—conditions that the application provided could not be waived by the agent (although we have held that this provision was unenforceable). In light of this latter fact and the absence of substantial evidence to support any contrary finding, we hold that Jackson's denial of the claim was both nonfrivolous and reasonable, even though it turned out ultimately to have been mistaken. *Cf. United Nuclear v. Allendale,* 103 N.M. at 486, 709 P.2d at 655 (because insurer had reasonable basis for questioning amount of claimed damages, it did not act unreasonably in failing to pay the claim).

■ This holding makes it unnecessary for us to resolve the issue debated in the parties' briefs on the cross-appeal: whether, given a finding of the insurer's unreasonableness in failing to pay a claim, an award of attorney's fees under Section 39–2–1 is mandatory or discretionary.[16]

The judgment in favor of Mrs. Receconi is affirmed insofar as it awards her $250,-000, plus prejudgment and postjudgment interest, and denies her claim for attorney's fees; the judgment is reversed insofar as it awards punitive damages. The judgment in favor of Peirce denying Jackson's claim for indemnification is reversed; and the cause is remanded to the district court for further proceedings consistent with this opinion.

IT IS SO ORDERED.

BACA and FRANCHINI, JJ., concur.

---

**16.** Since the parties have briefed the issue, we will comment, by way of admitted dictum, that the use of the word "may" in the statute suggests that awarding attorney's fees is discretionary, not mandatory; but we are inclined to agree with Mrs. Receconi that the court's range of discretion is narrow and that there is a presumption in favor of an award of attorney's fees (as there is in favor of awarding costs to the prevailing party), so that attorney's fees under the statute should ordinarily be awarded in the absence of a good reason for not doing so. *See Jacobs v. Stratton,* 94 N.M. 665, 668, 615 P.2d 982, 985 (1980) (under 42 U.S.C. § 1988, prevailing plaintiff should ordinarily receive attorney's fees absent special circumstances); *cf. Ranch World of New Mexico, Inc. v. Berry Land & Cattle Co.,* 110 N.M. 402, 404, 796 P.2d 1098, 1100 (1990) (prejudgment interest following breach of contract to pay definite sum of money "generally should be awarded absent peculiar circumstances"); *Kirby v. New Mexico State Highway Dep't,* 97 N.M. 692, 698–99, 643 P.2d 256, 262–63 (Ct.App.) (NMSA 1978, § 39–3–30 authorizes award of costs to prevailing party unless "court orders otherwise for good cause shown"), *cert. quashed,* 98 N.M. 51, 644 P.2d 1040 (1982).